DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

# STATE OF NEW JERSEY,

## NOVEMBER TERM, 1870.

---

FREDERICK STEVENS v. THE PATERSON AND NEWARK
RAILROAD COMPANY.

1. The state is the absolute owner of the land in all navigable water within its territorial limits, and such land can be granted to any one, either public or private, without making compensation to the owner of the shore.
2. By the local custom of this state, the shore-owner can reclaim the land between high and low water marks, but such privilege is a mere license, which the legislature may revoke at any time before execution.
3. The rights conferred by the wharf act are also revocable before execution by the land-owner.
4. A statute giving a railroad company the right to lay their road along a river, and to acquire the rights of the shore-owners, will not be construed to give, by implication, the right to take the land of the state lying below high water line.

---

In error to the Essex Circuit.

The suit below was in case. The declaration stated that the plaintiff was the owner in possession of a certain tract

of land adjoining to the Passaic river, and that said river was a public navigable river, and in it the tide ebbed and flowed; that the plaintiff had enjoyed free access from his lands to the river, for the purpose of washing, bathing, watering his cattle, and for fishing and navigation; and that the defendants have placed obstructions along the entire water front of said lands, consisting of piles, timbers, and stones, &c., whereby the access to the water was cut off.

The plea admitted doing the acts charged, and justified them by virtue of the legislative authority contained in the charter of the defendants. The provision conferring such authority, was recited as follows:

"That it shall be lawful to lay out, construct, and run their railroad along the Passaic river, from the village of Belleville to any point in the city of Newark, at or near Governeur street, and to acquire the rights of the shore-owners in the manner prescribed in the charter of said company in other cases, and may extend said road over said river, and for that purpose may construct and maintain a bridge, from some convenient point in the city of Newark, at or near Governeur street, to a convenient point on the east side of said river, in the county of Hudson, and with a draw of the width of sixty feet, to be located at a point convenient for navigation in said river; said bridge shall be constructed with a suitable passage-way or walk, for the accommodation of persons crossing the river; and the said Paterson and Newark Railroad Company may continue said railroad at the distance of not less than one hundred and fifty feet eastwardly of the river road or highway, and connect the same with any other railroad or railroads on the east side of said river, on such terms as may be agreed to, and may lay out and construct the same, passing under or over the Morris and Essex Railroad by a suitable bridge or arched passage-way; provided, that in passing by the lands of the Mount Pleasant Cemetery, the said railroad shall not encroach upon the lands thereof which are used for burial purposes in said cemetery, but the said railroad shall be

constructed entirely outside and to the east of the present stone wall embankment of the cemetery grounds, and near the line of high water in said Passaic river ; and before entering upon said lands, the said railroad company shall enter into an agreement with the Mount Pleasant Cemetery Company to construct a suitable stone wall, not less than six feet high, on the line between said railroad and the cemetery grounds."

The defendants claimed that this clause gave them the right to lay their road along the river below high water mark, as such lands belonged to the state.

The plaintiff demurred, and, after argument, judgment was given for the plaintiff.

The following reasons were assigned for the judgment by DEPUE, JUDGE :

" The title of the plaintiff, as the owner of lands bounded on tide waters, ends at high water mark.   Below the ordinary high water mark, the title to the soil is in the state.

" Except as against the state or its grantee, the riparian owner has certain rights of enjoyment in front of his upland, analogous to the rights which are incident to adjacency on a public highway.

" The section of the defendants' charter set out in their plea does not contain a grant, in express terms, of lands, the ownership of which is in the state; nor does it indicate an intent on the part of the legislature to authorize an interference by the defendants, with the usual privileges of riparian owners.

" The distinction between the grant of a mere franchise and a grant of a portion of the public domain is broadly marked.   With respect to the latter, the rule is invariably adhered to, that in cases of doubt, the grant is to be construed in favor of the state, and most strongly against the grantee, who will take nothing not clearly given him by the grant.

" To give to a legislative grant the effect of a conveyance to private uses of land, the proprietorship of which is in the state, it must clearly appear that the legislature intended to

make a grant of that character and description, or that the use of the public property is necessary to the enjoyment of the franchises which are granted.

"These principles are illustrated in the following cases: *Townsend* v. *Brown*, 4 *Zab.* 80; *Jersey City* v. *Morris Canal*, 1 *Beasley* 548; *Morris Canal and Banking Co.* v. *Central R. R. Co.*, 1 *C. E. Green* 419; *Keyport Steamboat Co.* v. *Farmers' Trans. Co.*, 3 *C. E. Green* 512; *Morris and Essex R. R. Co.* v. *City of Newark*, 2 *Stockt.* 352; *Commonwealth* v. *City of Roxbury*, 9 *Gray* 451, 494; *Inhabitants of Marblehead* v. *County Com. of Essex*, 5 *Gray* 451; *Com.* v. *Boston and Maine R. R. Co.*, 3 *Cush.* 25; *Doe* v. *Archbishop of York*, 14 *Q. B.* 81.

"In this case no consideration was received by the state for the alienation of public domain, nor does there appear to have been any intent by the legislature to aid the defendants in their enterprise, by donating public property to their use.

"The course of legislation for the last few years, shows the legislative appreciation of the great value of the lands under water which belong to the state. An intent to alienate any portion of them without any consideration, will not, in the absence of a formal grant, in express words, be implied, except upon the clearest necessity to effectuate the purpose of the legislature in investing the grantee with public franchises.

"The defendants cannot claim a right to occupy the lands in question by force of any implication from the powers which are granted to them. They may exercise and enjoy the franchise of laying out, constructing, and running their railroad *along* the Passaic river, from the village of Belleville to the city of Newark, without appropriating any of the lands of the state. The succeeding clause empowering them ' *to acquire the right of the shore-owners,*' by condemnation, clearly indicates a legislative intent that the franchises which were granted should be exercised upon property which was private property. The term ' shore-owners,' as

used in this connection, is not employed in a strictly technical sense, but in the sense of riparian owners.

"Upon the assumption that the defendants are rightfully in the occupation of public property, the clause last referred to must, for the purposes of this case, be entirely excluded from consideration. If that clause is relied on to establish a grant by the state, it is manifestly conditional, upon making compensation to private individuals, which should precede the occupation of the lands taken. It was competent for the legislature to prescribe that condition, though the riparian owner had no rights in the land under water which were not subject to legislative divestment, without compensation.

"If the section in question is viewed as an act of ordinary legislation by the legislature, as the law-making power of the state, and not as the instrument of grant of public domain, it will not aid the defendants. I concur in the views of Chief Justice Beasley, in *The Keyport Steamboat Co.* v. *The Farmers' Transportation Co.*, 3 *C. E. Green* 516, that the riparian owner has a natural equity to preserve and improve the connection of his property with the navigable water, and that the design to violate that equity by the legislature will not be deduced from the words of any statute, either general or special, except when it contains language not susceptible of any other rational construction.

"For the reason that the act of the legislature, set out in the plea, does not authorize the acts of the defendants complained of, judgment on demurrer is given for the plaintiff."

A writ of error was brought to remove the judgment and proceedings into this court, and general errors were assigned for reversing the judgment.

The case was argued by—

*Parker* and *Keasbey*, for plaintiff in error.

*Abeel, Frelinghuysen* and *Vanatta*, for defendants.

*The Attorney General (Gilchrist)* also appeared before the court, and presented an argument in behalf of the rights of the state.

The following opinion was delivered:

BEASLEY, CHIEF JUSTICE. The principal question which has been argued in this case is that respecting the interest of the state in the lands lying between high and low water marks in tidal rivers. In some of its aspects this subject is a familiar one to our courts; but, on this occasion, the point is, for the first time, distinctly presented, whether it is competent for the legislature to grant the soil under the water, so as to cut off the riparian owner from the benefits incident to his property from its contiguity to the water.

Notwithstanding the apparent skepticism of counsel upon the subject, I am constrained to think that some of the matters which were handled in the discussion before the court are to be considered as at rest. In my opinion, it is entirely indisputable that the proprietors of New Jersey did not, under the grant from the Duke of York, take any property in the soil of navigable rivers within the ebb and flow of the tides. This was the very point of decision in *Arnold* v. *Mundy*, 1 *Halst.* 1; *Martin* v. *Waddell*, 16 *Pet.* 367; and *Den, ex dem. of Russel*, v. *The Associates of Jersey Co.*, 15 *How.* 426.

Second, that this title to the soil under navigable water, which the common law of England placed in the king, was transferred by the revolution to the people of this state. The cases above cited completely establish this proposition.

And, lastly, in the case of *Gough* v. *Bell*, 2 *Zab.* 441, it was declared that the owner of lands along the shore of tide waters could extend his improvements by wharves and filling up over the shore in front of his lands to low water mark, unless prevented by the state, provided he did it so as not to interfere injuriously with navigation.

Thus far I regard the law in this state as founded in adjudications which ought not to be questioned, and which

cannot be disturbed. Assuming, then, as I do, the foregoing propositions as data in the discussion now before the court, the point of inquiry is narrowed to the single question which was regarded as left open in the case last cited, *viz.*, whether the owner of lands on tide water has such a right to the use of the water that the state cannot authorize any improvements in front of his lands which will destroy or abridge that right without compensation.

In the discussion of this topic, I will consider briefly, first, the right, so-called, of the riparian proprietor; and, in the second place, the rights of the state over the sea shore.

First, then, with regard to the rights of the owner of the upland. In the case of *Gough* v. *Bell*, in this court, I observe that Mr. Justice Nevius and Mr. Justice Potts put their opinion on the ground that the riparian owner, at common law, was invested with certain rights in the water as appurtenant to his estate. And in the case of *Gould* v. *The Hudson River Railroad Company*, 2 *Seld.* 544, Mr. Justice Edmonds in a dissenting opinion, expresses a similar view.

I have not found that any other judge has ever based a decision on such a ground. The theory on which those opinions are founded seems to me the result of misconception. "The riparian proprietor has a right," says Mr. Justice Potts, "though his strict legal title is bounded by the high water line, to the water as appurtenant to the upland; a right of towing on the banks, of landing, lading, and unlading; a right of way to the shore; a right to draw seines upon the upland, and of erecting fishing huts. He has the right of fishery, of ferry, and every other which is properly appendant to the owner of the soil; and he holds every one of these by as sacred a tenure as he holds the land from which they emanate." The error in this statement arises from overlooking the fact that some of the rights enumerated belong to the riparian proprietor as a member of the community, and that others of them belong to him in his character of owner of the soil. Not one of the privileges in the water which are ascribed to him emanate from his

ownership of the land. In common with every other citizen, he can fish in the water, and pass and repass to and from the water along the shore. But he has not these rights by virtue of his property; they attach to him as an individual, and he holds them in common with other citizens. They are part *rerum communium*. Then, again, it is true, it is lawful for him to land on the bank, and to dry his nets and to build fishing huts there. But the right to do these things, and which are not privileges in the water, appertain to him in the ordinary way, as the owner of the land. The case is merely this: the man who owns the land next to navigable water is more conveniently situated for the enjoyment of the public easement than the rest of the community. But a mere enumeration of the advantages of that position falls far short of showing that such proprietor has, in the *jus publicum* by the common law, more or higher rights than others. It will be observed that in the sentences above quoted, it is averred that the rights referred to emanate from the ownership of the soil; this is certainly true as to certain of them, such as the right to erect fishing huts, &c., but with respect to the usufruct of the water being appendant to the land, in any legal sense whatever, that is the point to be proved, and it is simply assumed. The question is one of mere tradition, precedent, and ancient authority. When and by whom was it ever claimed, from the days of Bracton to the present time, that the ownership of the upland drew to it any rights in the sea shore, or peculiar uses of the water? In the opinion commented on, no common law authority is cited, and the few American cases referred to are so manifestly misapplied that it is not necessary to subject them to criticism. My examination has been so thorough that I feel confidence in saying that none of the ancient authorities can be found—and they, of necessity, must be our guides in this inquiry—which give countenance to the notion that any such privileges as those claimed are appurtenant to the bank or *ripa* of navigable water. Indeed, so far has the bank owner been from making claim to

any peculiar privileges of this kind, that the reverse has occurred, and the contested question has been, whether his land, for the convenience of the public, was not subject to certain servitudes; whether such land might not be crossed in going to and returning from the water ; whether the right to tow boats along the bank or to land, or to dry nets upon it, was not a public right incident to the use of the water. These and similar questions have been mooted in the courts, some of which remain unsolved to the present day, while others have been decided, though not without hesitation and difficulty, in favor of the riparian proprietor. In all these controversies, extending from ancient through modern times, I do not find that it was ever even suggested that, as an incident to his estate, the owner of the *terra firma* along the line of tide water was possessed of any peculiar privileges, with the exception of those of alluvion and dereliction—privileges which are, perhaps, countervailed by the loss to which he is subject from the washing away of his land. That this is the true position of the land-owner at the common law, will, I think, more clearly appear when I come to set forth the rights of the king in the sea shore, to which subject I now proceed.

The language of the old books is, " that the sea is the king's proper inheritance," and he is styled " the lord of the great waste," " *tam aquæ quam soli.*" Co. Litt. 107, 260 b ; Colles 17 ; 3 Leo. 75 ; 2 Molloy 375.

And this was property susceptible of transference. There are some antique instances of grants by the kings of England of certain portions of land under the sea. Lord Hale recites several transfers of this description. *Hale, de jure maris,* 14–28. It is true that such conveyances, at least in modern times, did not pass the property disencumbered of the public right of navigation and fishing ; but still it is clear that the tenure of the soil carried with it certain valuable rights. In fact it appears to have been possessed of the ordinary incidents of property on *terra firma.* It could be put to any use not inconsistent with the public easements

with which it was burthened. If it was unlawfully appropriated or interfered with, the law afforded it protection. There are cases, both ancient and modern, showing that this *districtus maris*—this land covered with water—was a property susceptible of valuable uses. Thus, in the celebrated case of the *Royal Fishery in the Banne, Davies' Rep.* 149, it is said : " The city of London, by a charter from the king, hath the river Thames granted to them, but because it was conceived that the soil and ground of the river did not pass by that grant, they purchased another charter, by which the king granted to them *solum et fundum* of the said river ; by force of which grant the city to this day receives rents of those who fix posts, or make wharves or other edifices on the soil of said river." It cannot fail to be observed how entirely this case explodes the assumption that the riparian proprietor has any common law right to extend his front, either by filling in or by the erection of a wharf. Such acts would have been trespasses on the private property of the sovereign.

The modern case illustrative of the same subject, to which I will particularly refer, is that of the *Attorney-General* v. *Chambers,* 11 *De Gex, M. & G. Rep.* 206. This was an information against certain owners and lessees of a district abutting on the sea shore. The information alleged that by the royal prerogative, the sea shore and the soil, and all mines and minerals lying under the sea, and all profits arising therefrom, belong to her majesty, &c. ; that there were very valuable veins or strata of coal lying under that part of said district which was contiguous to the sea shore ; that the sea shore vested in her majesty extended landwards as far as high water mark in ordinary spring tides, or, at all events, far beyond high water mark at neap tides ; and that the defendants had encroached upon and worked valuable mines under the shore. The general right of the queen as stated was admitted, the only question which was put in controversy being as to the extent of such right. A verdict was taken, by consent, for the crown, and the court decided that

the right of her majesty to the sea shore landwards is, *prima facie,* limited by the line of the medium high tide between the spring and neap tides. This decision was made in the year 1854.

From these two cases it seems to me most conspicuous that the ownership of the shore under the sea drew to it all the usual rights of property. It could be leased out for wharves or worked as a coal mine. We are also to bear in mind that the sea shore could be granted in gross—that is, without being parcel of the upland. *Hall on the Rights of the Crown, &c., p.* 19. I also refer, for a number of examples in which claims of the crown similar to the foregoing have been successfully enforced, to an article in *vol. vi., p.* 99, *of the Law Magazine and Law Review.* From this essay it appears that "the advisers of the crown, for the last quarter of a century, have exercised unusual vigilance respecting, and been most active in realizing the royal claim to the fore shores."

Among other notable instances the following one is thus described : "An earlier case was one of an information for intrusion, filed in 1833, by Sir William Hone, when attorney-general, in the Court of Exchequer, to establish the right of the crown to a tract of land containing about two hundred and seventy acres, formerly overflowed by the tide, situate near the city of Chester, on the south bank of the Dee, a tidal navigable river. The suit terminated in favor of the crown, and the land was subsequently sold by the crown." Nor do I find the royal right anywhere, in the long line of adjudications upon the subject, called in question with respect to its general features. It is admitted, in the fullest extent, in the conspicuous modern cases. *Lord Advocate* v. *Sinclair of Foss, L. R.,* 1 *Scotch Appeals* 174 ; and *Gann* v. *The Free Fisheries of Whitstable,* 11 *House of Lords Cases* 192.

Indeed, I think it is safe to say that no English lawyer, speaking either from the bench or bar, has ever asserted that the owner of the land along the shore of navigable water has

any peculiar right, by reason of such property, to the use of the water or of the shore. And it seems entirely incredible to suppose that such a right as this could have existed, and that no allusion should have ever been made to it. It is obvious that many of the controversies which have been before the courts would have been largely affected by the existence of such a right. Such would have been the effect in the case of the *Duke of Buccleuch* v. *The Metropolitan Board of Works*, the report of which has come to hand since the argument on the present occasion. *L. R.*, 5 *Exchequer* 221. The facts of the case are thus stated: "The Duke of Buccleuch, the plaintiff, had a certain interest under a lease and two agreements from the crown in a mansion in Parliament street, the back of which was parallel to and bounded by the river Thames; and the Metropolitan Board of Works, the defendants, had constructed, by force of an act of parliament, an embankment between the back of the plaintiff's premises and the river. For the purpose of this construction the board of works had found it necessary to remove the area or mass of water which formerly used to run at the back of the premises between high and low water mark, and also to take away a causeway or jetty running from the foot of some stairs on the plaintiff's land across the shore to low water mark. It will be observed that the facts of this case were, in all essential particulars, the same as those embraced in the one now before this court, with the exception that in the reported case the plaintiff had a jetty in controversy extending from his land to low water mark. The act under which the defendants had erected their embankment required, where land was taken, compensation to be made, and directed that in estimating 'the purchase money or compensation to be paid by the promoters,' regard should be had ' not only to the value of the land to be purchased, but also to the damage, if any, to be sustained by the owner of the lands by reason of the severing of the lands taken from the other lands of such owner, or otherwise injuriously affecting such other lands by the exercise of the powers,'" &c. The

plaintiff's claim for compensation was two fold : first, for the destruction of the jetty or landing place; and, second, for the taking away of the water which used to flow along the river side of the premises. The court held that the only damages the plaintiff was entitled to were those resulting from the destruction of the jetty or landing place; but that the general damage occasioned by the interposition of the embankment of the defendants along the water front of the premises were *damna absque injuria.* This was regarded as a case of great importance, and was fully argued and considered, and yet it was not intimated, either by counsel or any of the judges, that the plaintiff, as riparian proprietor, had any right, the deprivation of which was a legal injury or afforded even any just ground for complaint. In the whole case there is not a hint of the supposed existence of such a right.

From these authorities and many others which might be cited, it appears to me to be plain, that by the rules of the ancient law, the owner of land along the shore was entitled to no right as an incident of such township, except the contingent ones before referred to of alluvion and dereliction; and that, on the other hand, the title to the soil under tide water was in the sovereign; and that such title was attended with the usual concomitants of the ownership of realty. And it consequently followed from this result, that in order to enable the owner of the upland to fill in or wharf out below the line of high water, it was absolutely necessary to adopt some principle different from those of the common law. And this, as I understand, was the foundation on which the majority in this court placed themselves in the decision of the case of *Gough* v. *Bell*. That final decision was a concurrence in the view expressed by Chief Justice Green, in his opinion delivered in the Supreme Court; and that view was, as I apprehend, the only one which could invest the claim of the land-owner to extend his lands by artificial means below the line of high water with the faintest semblance of legality. As such claim could not rest on the

common law, it was indispensable to invoke and sanction a custom or local usage variant from the common law. How far such a custom, as a mode of acquiring a title to real estate, can be made to harmonize with legal principles, it is not necessary to inquire, for as before remarked, I consider the existence and legality of such a usage to be *res adjudicata* in this state. Admitting its legal existence, then, the inquiry presses as to its effect in law. It confers a right by the legal exercise of which, the bank-owner may encroach on the public property between high and low water marks. If such a right existed by force of the common law, as an incident of property, it is obvious it could not be destroyed or substantially impaired by the legislative power, without compensation. The question is, whether this customary right has the same quality and efficiency as though it appertained to the land by force of the common law.

My consideration of this branch of the subject has led to the conviction that such privilege has not the effect suggested in the above inquiry. The local custom in question was nothing more than a license on the part of the public to the land-owner, enabling the latter to fill in or wharf out along the fore shore between high and low water marks, and which license, when executed, became irrevocable. The shore-owner acquired his indefeasible right by the acquiescence of the public in the performance of the act. That this was the view of the judges whose opinions prevailed in the decision of *Gough* v. *Bell* is, I think, clearly manifest. I have above observed that the true doctrine with respect to this local custom is embodied in the opinion read in the Supreme Court by Chief Justice Green. In that opinion, this clear statement with respect to the necessity of the execution of the license, as a pre-requisite to the acquisition of a legal right on the part of the land-owner, is to be found, *viz.*, "In New Jersey, as we have seen, the title of the state extends, as at common law, to high water mark as it actually exists. Where the waters have receded by alluvion or by the labor of the adjoining proprietor, the title of the state does not

extend beyond the actual high water line. That every en-croachment upon the shore or other part of the public domain may, at all times, be restricted or controlled by the legisla-ture, is admitted. That any erection prejudicial to the com-mon rights of navigation or fishery may be abated, is not denied. But in the absence of such legislative restriction, where no nuisance is created, the riparian proprietor may appropriate the shore between high and low water mark to his own use." This language is too clear and explicit to need explanatory comment. That the local custom of the state which was recognized and enforced by the court, operated as a simple license to the riparian owner to enlarge his posses-sions at the expense of the public domain, and which license was revocable at any time before execution, is the clear doc-trine of the adjudication in question. It has no reach beyond this. And from that time to the present, I do not perceive that the judiciary of this state have been in any doubt upon this subject. Whenever the doctrine has been referred to, the question has been treated as being entirely at rest. In the year 1856, in the case of *The State* v. *The Mayor and Common Council of Jersey City*, 1 *Dutcher* 525, certain lands lying under the flow of the tide were thrown out of a tax assessment for the reason that the title to such lands was in the state, and Mr. Justice Elmer, with characteristic direct-ness of expression, defines the public title thus: "It must now be accepted as the established law in New Jersey, that the right of the owner of lands bounding on a navigable river extends only to the actual high water mark, and that all below that mark belongs to the state. The inchoate right, if such it may be called, which the proprietor of the upland has, either with or without a license, to acquire an exclusive right to the property, by wharfing out or otherwise improv-ing the same, gives him no property in the land while it remains under the water. It may be granted by the state to a stranger at any time before it is actually reclaimed and an-nexed to the upland. Such is unquestionably the common law, and I am aware of no alteration of it in this respect in New

Jersey." In this opinion, Chief Justice Green and Justices Ogden and Haines concurred. Again, after an interval of several years, the rule was treated by the same court as established. I refer to the case of *Stewart* v. *Fitch and Boynton*, 2 *Vroom* 18. This was a suit by a riparian owner for the use of certain flats by the rafts and lumber of the defendants, and among other reasons given for dissent to the legality of the plaintiff's claim, the court said : "But it also appears that the flats on which the rafts were anchored were all below high water mark, and, at high tide, covered to the depth of two feet, and that no part had been in any wise improved or reclaimed, and that, consequently, the title to them was not in the plaintiff, but in the state of New Jersey." From these cases, I think it is evident that from the date of the decision of *Gough* v. *Bell* up to the time of the present controversy, the question now under consideration has not been considered an open one by the courts of this state. And such, too, appears to have been the legislative and public understanding of the effect of this leading decision just mentioned, at the time that it was rendered. This, I think, is manifest from the provisions of the act of 1851, entitled "An act to authorize the owner of lands upon tide waters to build wharves in front of the same." *Nix. Dig.* 1025.* By the first section of this act it is declared "that it shall be lawful for the owner of lands situate along or upon tide waters to build docks or wharves upon the shore in front of his lands, and in any other way to improve the same, and when so built upon or improved, to appropriate the same to his own exclusive use." Thus we find in this provision, and in similar provisions in many other laws, the local custom sanctioned in the case of *Gough* v. *Bell* assuming a statutory form and subject to certain general regulations. The right of the bank-owner was dealt with by the legislature not as an incident of property already vested, but as a privilege which required the element of public acquiescence, and the performance of a pre-requisite on the side of the proprietor, to be converted into a legal right. Nor should it fail to be observed that even if we

* *Rev., p.* 1240.

were to admit the indefeasibility of this customary right of the shore-owner, such concession could not have much effect in securing him against the exercise of legislative power. By force of such a doctrine, the land lying between the high and low water lines could not be taken from him without compensation; but below the low water line, the public right and control would be still absolute. But I have said such concession cannot be made. The bank-owner has, by the local custom of the state, but an inchoate right before the reclamation of the land below the water; nor does he gain anything in this respect by the statute just referred to. That act did not add anything to the efficiency of the local custom as a mode of acquiring title. It left that right as it found it—a pure license, revocable before execution. Such acts, bearing the form of legislative licenses, are not uncommon, and their effect has been clearly defined. It has never been thought that the privileges conferred by them were vested rights in the sense of debarring the public from revoking them at pleasure. Two cases in point, which have arisen in Pennsylvania, I will refer to as illustrative of the principle. By a statute of that state, all persons owning lands adjoining navigable streams were authorized to erect dams in such streams, and appropriate the water to the uses of their mills. In the cases of *The Susquehanna Canal Co.* v. *Wright*, 9 *Watts & Serg.* 9; and *The New York and Erie Railway* v. *Young*, 33 *Penn.* 175, it was declared that the rights acquired under this act were not indefeasible, but were subordinate to the rights of the commonwealth. This result was justified by the theory that such licensees took their privileges under the implied condition that they should be held in subordination to the requirements of the public. These decisions go to the point that a legislative permission to appropriate to individual use a part of the *jus publicum*, does not, *per se*, deprive the public of a right to resume the privilege granted, unless it appears that it was the intention to vest such privilege irrevocably in the licensee. The wharf act of this state clearly leaves, in this respect, nothing in

doubt, for it expressly announces that after the riparian proprietor has, in point of fact, erected his wharf or made any other improvement below the high water line, then, and not till then, the land so appropriated shall become his own. Prior to this event, he has no rights in the water or the land under it, either by the statute or by the local custom, which are not subservient to the legislative will.

The steps which I have thus far taken have led me to this position: that all navigable waters within the territorial limits of the state, and the soil under such waters, belong in actual propriety to the public; that the riparian owner, by the common law, has no peculiar rights in this public domain as incidents of his estate, and that the privileges he possesses by the local custom or by force of the wharf act, to acquire such rights, can, before possession has been taken, be regulated or revoked at the will of the legislature. The result is, that there is no legal obstacle to a grant by the legislature to the defendants, of that part of the property of the public which lies in front of the lands of the plaintiff, and which is below high water mark. It may be true that by such an appropriation, the plaintiff will sustain a greater inconvenience than will other citizens whose land does not run along this river. But the injury to all is in its essence and character the same, the difference being only in degree. All persons who have occasion to approach this river over that part of the bank occupied by the railroad of the defendants, may, perhaps, experience some inconvenience from the interposition of such works: the railroad, therefore, is somewhat of an impediment to the public rights of fishery and navigation. But no one, it is presumed, will pretend that such impediment is, on that account, illegal, if authorized by the legislative authority. Nor can the plaintiff complain because a difficult access to the water is a greater hardship to him, owing to the easy use of the water, in connection with his property in its natural condition, than it is to those who live at a distance from it. If it were true that no public improvement can be made which, in its execution, will affect

the property of one citizen more injuriously than it will that of another, many of the greatest works of the times would become impossible. No railroad or canal can be constructed which will not greatly benefit the lands of some persons, and injure almost as greatly those of others. Every citizen is required, at times, to contribute something, by way of sacrifice, to the public good. Such partial evils are the price which is paid for the advantages incident to the social state. It is not˙necessary to refer extensively to authorities in confirmation of the doctrine that, as a general rule, the public domain is subject altogether to the control of the legislature, and that incidental damage resulting to individuals from the exercise of such control, gives no legal claim to compensation. The principle seems universally conceded that, unless in certain particulars protected by the Federal constitution, the public rights in navigable rivers can, to any extent, be modified or absolutely destroyed by statute. By force of the constitution of this state, private property cannot be taken, even for public use, without just compensation. But the dominion of the legislature over the *jura publica* appears to be unlimited. By this power they can be regulated, abridged, or vacated. We have seen that, by the common law, the king was the proprietor of the soil under the navigable water, and this being regarded as a private emolument of the crown, was susceptible of a transfer to a subject. But such transfer did not divest or diminish, at least after *Magna Charta*, the public rights in the water, and consequently the grantee of the crown held the property in subjection to the common privilege of fishery and navigation. The consequence was, that the king could not deprive the subjects of the realm of these general rights. This was a power that resided in parliament, and not in the monarch. But that such a parliamentary power existed, appears never to have been questioned by any English authority, nor do I perceive that its exercise was ever regarded as a legal wrong, or even as an unusual hardship to the owner of the land along the shore. In the year 1780, this authority of parliament

to put to use the land under tide water, thus intercepting the land-owner, was fully recognized by Lord Mansfield. The case referred to is that of *The King* v. *Smith, Douglass* 441. The city of London, under an act in the time of George III., had erected piles on the bed of the Thames, near Richmond, within high water mark, about the distance of twenty-nine feet from the shore, for the purpose of making a towing-path for horses, adjoining and contiguous to a wharf in the possession and the property of the defendants, or of those under whom they claimed. The defendants cut down one of these piles, which was proved to have been erected between the high and low water marks, opposite to the said wharf. For this act an indictment was found, and the defendants were convicted. The case came before the court on a motion to arrest judgment. In the argument of this case none of the distinguished counsel employed for the defence questioned the right of parliament to appropriate the land in question in the manner specified, if the Thames, at the point in question, was within the reach of the tide, the entire predication being that such was not the fact. The conviction was sustained. I think the power of parliament, in affairs of this character, is not to be denied. Nor was this one of those severe prerogatives which existed only in consequence of the theoretic omnipotence of the legislative branch of the British government. Whatever the theory, we know what the practice has been, and it is scarcely too much to say that, since the days of the revolution, no instance can be found of any Englishman being deprived of any right of property by act of parliament. A statute putting to use the land under tide water was regarded as legitimate—not because the power of parliament was unlimited, but because the control over the public domain was unlimited. And, in fact, the absence of a power to control and put to use the public interests in the navigable waters would be an imperfection in the civil polity of any people. I do not find that it has ever been supposed that such a power did not exist in any of the American states. By a statute of the state of Delaware, a citizen was

authorized, for the purpose of improving his lands, to close the mouth of a navigable creek, and such statute was pronounced to be constitutional, and the act done under it legal, by the Supreme Court of the United States. *Wilson* v. *Blackbird Creek*, 2 *Peters* 245. In *Glover* v. *Powell*, 2 *Stockt.* 211, a similar law was enforced, and in the case of *The Mayor of Georgetown* v. *The Alexandria Canal Company*, 12 *Peters* 91, it was held competent for congress, acting as the local legislature, to authorize the erection of the canal in question, although the same was admittedly injurious to the interests of the riparian owners. This same doctrine was enforced in the case of *Gould* v. *Hudson R. R. Co.*, 12 *Barbour* 616; 2 *Selden* 522, on a scale of the greatest magnitude, the road of the defendants being located along the Hudson, and intervening for many miles between the water and the land of the bank-owners. See a collection of cases to the same effect, in *Angell on Tide Waters* 92–108. It is upon this principle that water, in large quantities, is taken from our rivers to feed our canals, and that dams are placed, to the destruction of navigation, in our rivers for the use of manufactories. Our state affords many instances of a display of this power in this form.

With regard to the hardships oftentimes incident to the exercise of such a power, the courts can have no concern. Such considerations address themselves exclusively to the law-makers. It is the office of the court to declare, if the law leads to such results, that the legislature has the authority to regulate or destroy at its pleasure, and for the common welfare, the public rights in navigable rivers, and that if individuals are, in consequence thereof, incidentally injured, such loss is *damnum absque injuria*. If compensation be made for such damage, it is on the part of the state a mere gratuity, for neither the riparian proprietor no any other citizen whose property has been impaired can claim such redress as a matter of legal right. In all such cases the appeal must be to the sense of justice of the legislature.

The result being that the legislature, can authorize the

laying of this road in front of the land of the plaintiff without compensation, the next question is, has such a privilege been conferred on the defendants?

The claim is, that the legislature has granted to these defendants the use of a part of the public domain. The state is never presumed to have parted with any part of its property, in the absence of conclusive proof of an intention to do so. Such proof must exist, either in express terms or in necessary implications. I shall not cite authorities to sustain so familiar a proposition. With respect to this statute now drawn in question, and by the supposed force of which the defendants have erected their works, I fully concur in the view expressed by Mr. Justice Depue, in the opinion read by him in the Circuit Court. I think there are no terms used in this statute which, fairly interpreted, imply an intention to confer on the defendants the privilege asserted, nor does such privilege necessarily result from the general powers conferred. This plea, therefore, presents no bar to the action of the plaintiff.

With respect to the question raised in the argument, touching the sufficiency of the facts stated in the plaintiff's declaration to sustain his suit, I will merely say that it seems to me that a legal cause of action is shown.

The substantial allegation is, that in consequence of the works of the defendants, he is prevented from passing from his land to the river Passaic, which at present is a public highway.

Now it is true that, as the defendants have put these obstructions in this river without authority of law, such obstructions are a public nuisance. But I think it is a nuisance which, according to the allegations on the record, inflicts a peculiar damage on the plaintiff, and if that be so, it is admitted this action is well brought. The plaintiff, until the state interferes and deprives him of the privilege, has the right to pass directly from his property on to the shore of this navigable river. He has been deprived of the right by the tort of the defendants, and this is a damage which, apparently, is individual and peculiar to himself. If a ditch

should be dug in a public highway, in front of the door of a dwelling-house, so as to cut off access to and from such house, no one would doubt that the occupier of such house sustained a greater inconvenience from the public nuisance than the body of the community. The character of the present tort, as it respects the plaintiff, is precisely of this nature. I think the facts stated support the action.

The judgment in the Circuit Court should be affirmed.

THE CHANCELLOR (dissenting.) The main question in this case which we are called upon to decide, and which has been so fully argued is, whether the owner of lands bounding on navigable tide waters has any right either in the shore, or to have his land retain its natural connection with, and adjacency to those waters, which cannot be taken from him without compensation.

The question is an important one, and its consequences of great moment. On the one hand, every owner of lands on such waters who has purchased and held them in the belief that this adjacency to the water added to their value, and was an incident that could not be taken from him, must lose this supposed right without compensation. And the owner of docks and wharves built by permission of the state, and only valuable for purposes of commerce, may have their value destroyed by a grant to a stranger of ten feet under water adjacent to them. On the other hand, the state will be entitled to the profits and advantages of a sale of all the fisheries the water fronts in its bounds, which, in front of the lands on the Hudson river and bay of New York, and especially of the docks and wharves erected there, will be of immense value and contribute greatly to the financial prosperity of the state, to the advantage of all the inhabitants, and inflict injury on no one except those who have purchased rights, and built wharves, piers, or docks, with indiscreet confidence in the opinions of lawyers and judges, the declarations of legislators as to the rights of the riparian owner, the legislation of the state seemingly conferring certain

rights, and in the apparent current of public opinion. The tendency of recent legislation upon this subject has been to take from the owners of lands along the shore, for the benefit of the state treasury, all such rights as are not vested in them as property, by laws which cannot constitutionally be altered or repealed.

And it is the duty of this court of the last resort to determine the extent of those rights as a strict question of law, without regard to the wisdom, justice, or policy of the legislation which affects them. This duty the courts must perform, without stopping to consider whether the taking away by force of legislation, rights once given, where the power to take back exists, might not injure the credit of the state. The good faith and expediency of such matters are for the legislature alone.

The rights contended for on part of the shore-owner are placed upon three grounds : first, the general principles of the common law ; secondly, the principles of the common law as they have been adopted by the legislature, courts, officials, lawyers, and people of New Jersey, and applied to the navigable tide waters in the state ; and, thirdly, the statute of 1851, commonly known as the wharf act, and its supplements.

As to the common law, it must be assumed that by the decisions in this state the right of soil on the shore to ordinary high water mark is vested in the state.

And the question here is, has the shore-owner, as incident to his land, a right to retain its adjacency to the waters, and the profits and benefits to be derived from it ? The common law recognizes and secures to lands in other cases such rights and benefits derived from their natural situation relative to other lands. Such are the right to support of the natural soil, and the right to have water courses flow upon and from the land unobstructed and uncorrupted. These are rights, if not in the adjoining land, yet to have the control and dominion of the owners of the adjoining lands so modified and limited as not to interfere with them. An adjoining owner,

although absolute proprietor of the soil to any depth, cannot remove that soil, so as to deprive his neighbor of the natural advantage of its support.   The owner of lands through which a stream runs has no right in the water while yet on the lands above him.   Yet he has a right to have the natural flow of the stream preserved, so that it may come to his land and he have the benefit of it.   It is a right of property.

On the same principle the advantage which the adjacency of navigable tide waters naturally flowing by his land, is to that land by its situation, should be held to be a right, property of which the owner cannot be deprived.   There is no reason for support from soil, or the free flow of fresh water streams that does not equally apply to this.   The maxim *aqua currit et debet currere* is as applicable to tide water as to fresh water rivers of the same size, and for the same reason should be applied to them by the courts.   The principles of law as to the right to advantages accruing from natural situation should be uniform, except where some reason exists for difference in their application.   None does here.

The right of an owner of lands upon tide waters to maintain his adjacency to it, and to profit by this advantage, is founded upon a natural sense of justice that prevades the community, which, although the decisions of the courts may overcome, neither they nor the subtle and artificial reasoning of learned juris-consults will ever eradicate.   To this, reference is made by the Chief Justice, in his opinion in this court in the *Keyport Case*, 3 *C. E. Green* 516, where he says "that the public sentiment, from the earliest times to this day, and the whole course of legislative action in this state, had recognized a natural equity, so to speak, in the riparian owner to preserve and improve the connection of his property with the navigable water.

The hardy, enterprising pioneers who have extended and are extending this country into the western wilderness, enter and purchase government lands, and select those adjacent to navigable streams, even when in other respects inferior, on account of the great advantage arising from this natural

situation, in full confidence that this advantage cannot be wrested from them and sold to some intervening speculator who shall come out, after their lives of sacrifice and privation have given value to these once worthless banks. And the united moral sentiment of the public would condemn legislatures and courts who should mould the law so as to deprive them of these fair, natural advantages of their location. So, when two centuries ago the bold emigrants who founded this republic, in exercising the choice of location that was conceded to them as an inducement to undergo the hardships of this new life, selected, as the most valuable, lands on the banks of the Passaic and Hudson rivers for their adjacency to those waters, in preference to richer well-watered lands in the interior, it seems eminently unjust to take from them the natural advantages of such location, even if the object is to fill the treasury of the state, and relieve from taxation lands in the interior, to which the water power and minerals—the natural wealth which creates their value—are left undisturbed, as incidents belonging to them which cannot be interfered with. If the rule of the common law is more narrow, these rights here should be settled by a more liberal rule than that applied in England to lands parceled out to his followers and favorites by the Norman conqueror.

But in the English authorities or decisions we find little on the subject of these rights of adjacency. There, the soil under water was vested in the king, in trust for the public. Grants for public or private use were made only by parliament, who had unlimited power to dispose of all private property and rights, with or without compensation. Any grant by parliament gave right. Yet in the case of *Bell* v. *The Hull and Selby R. R. Co.*, 6 *M. & W.* 699, upon a grant by act of parliament of a right to build a railway in a navigable river, on condition that compensation should be made to the owner of any wharf that should be injured by it, it was held by the Court of Exchequer that the owner of a wharf not taken or touched by the railway, but the access to which was rendered less convenient, was entitled to com-

pensation, on the ground that he was *injured*, which could not be unless he had a *right* to the access that was affected. The word used signifies deprivation of right. The recent case of *The Duke of Buccleuch* v. *The Metropolitan Board of Works*, 5 *Ex. R.* (*L. R.*) 221, decided in the Exchequer Chamber, as I understand it, admits this right and is based upon it. The plaintiff, in 1810, leased from the crown, for sixty-two years, crown lands, part of the grounds of the old palace of Whitehall, extending from Whitehall street to the Thames, separated from the Thames at high water mark by a high wall, beyond which was the shore; in the lease and the plan annexed to it, this wall was the limit of the lands demised. The usual words, with all ways, passages, waters, easements, advantages, and appurtenances thereunto belonging, were added. This lease had been renewed in 1858, for ninety-nine years. There were steps down from the garden to a door in the wall, of which the plaintiff had the key, from which a wharf, called a jetty, four feet wide, projected into the Thames to low water, which had been used by the lessee since 1818 to bring coals and other articles to the premises. This jetty was not mentioned in the lease or renewal, or marked upon the plan. The defendants, in constructing the Thames embankment, had destroyed the jetty and raised the embankment which extended into the river over and beyond the shore, to a height much above the old wall, and laid out a road on this embankment. The arbitrators who assessed the damages awarded £200 for destroying the jetty and access over it to the water; £5,000 for the amenities, consisting of the view over and beyond the river, the privacy and protection from noise and dust; and over £2,000 for other matters. None were claimed or allowed for cutting off access to the river from other parts of the garden, from which the wall, the limit of the demise, rendered such access impossible. The only property or easement taken was the jetty and the access to the water over it. The third plea denied that the plaintiff had any right in the jetty or any easement over it. The judgment in both courts was for the

plaintiff on that plea, and every judge held that he had an easement or right of access to the water over it: some intimated that he had a right to the soil in the shore. Now, as the lands demised were the private domain of the crown, held for the personal benefit of the sovereign, a demise of these could not, by implication, convey a right or easement in the shore held as sovereign in trust for the people. This result could only be reached on the ground that the land, the domain of the crown, had attached to it a right of access to the river over the shore, which, like other appurtenances, passed with the land, where not cut off by a wall which the tenant had no right to remove.

The only part of the award which the court held to be illegal was the £5,000 allowed for the amenities, and this did not include the damage by cutting off the access to the river beyond the wall.

The case settles the doctrine that lands of the crown have the right of access to navigable waters over the shore in front, held by the sovereign in trust for the public; that this right passed with the land when demised to a subject, without being specified, and is property which cannot be taken without compensation when compensation is required.

Chief Justice Taney, in *Martin* v. *Waddell's Lessee*, 16 *Pet.* 414, speaks of the disappointment to the expectation of the people who had settled this, and encountered the hardships of emigration to the new world, "if the land under the water at their very doors was liable to immediate appropriation by another as private property, and the settler upon the fast land thereby excluded from its enjoyment, and unable to take a shell-fish from its bottom, or fasten there a stake or bathe in its waters, without becoming a trespasser."

Against this doctrine of right by adjacency, the case of *Gould* v. *The Hudson River Railroad Co.*, 12 *Barb.* 616, affirmed by the Court of Errors in New York, (2 *Seld.* 522,) is urged as establishing the contrary doctrine—that is, that the riparian owner on tide waters has no right of access to the waters or other rights to these waters which is property,

and which cannot be taken or granted by the state at pleasure. This case, in the state where it is authority, establishes that doctrine. But neither the reasoning on which the result is founded, or any established standing or reputation of the judges by whom it was decided, in my view, is sufficient to induce this court to disregard the principles settled in like cases, which should be followed in this, or the respect due to a like number of judges of our own state, of equal learning and ability, who have held the contrary doctrine. The opinion of Justice Barculo in the court below is unsatisfactory, and does not consider the real point in question—the right to the *natural* advantages of the situation which in other cases is held to be property.

He compares it to the case of loss of custom by change of roads and of the course of travel; and to the case of a building injured by excavations of the line by the adjoining owner, without noticing the established right of adjoining owners to the support of the *natural* soil by the adjoining soil—a right, from the natural situation of the premises, similar to that under consideration, and which would have led him to the contrary conclusion. The opinion of the Court of Errors was concurred in by five of the eight judges who composed the court; one did not hear the cause; one other did not concur; and Justice Edmunds delivered a dissenting opinion. The opinion of the court by Justice Watson is founded mainly, if not entirely, on the decision in *Lansing* v. *Smith*, 8 *Cow.* 146, and 4 *Wend.* 9. That was a suit by the owner of a wharf in the Albany basin, a part of the Hudson river, separated from the rest of the stream by a pier and lock for the convenience of the canal navigation. The injury sustained by Lansing was not that he was cut off from the river, but that access to it, or the residue of it, was rendered inconvenient by the pier and lock, an inconvenience which he suffered in common with all owners of wharves and water fronts on the basin.

In the opinion of the Supreme Court, by Justice Sutherland, he says the claim of the plaintiff as riparian proprietor

Stevens v. Paterson and Newark R. R. Co.

was "to the natural flow of the river, with which the state had no right to interfere by erections in the bed of the river, or in any other manner," and that " the proposition appears to the court too extravagant to be seriously maintained. It denies to the state the power of improving the navigation of the river by dams or any other erections which must affect the natural flow of the stream, without the consent of all the proprietors on the adjacent shore within the remote limits which may be affected by the erection." This is a very different claim from that of the right of the state to cut off the owner from access to the river. The judge so understood it, for immediately after this he says "the right of the plaintiff to navigate to and from his dock is not denied ; all that is contended for on the part of the defendants is, that the mode in which that right is to be exercised is subject to be controlled and regulated by the legislature as, in their judgment, the interest and convenience of the public may require."

There are two distinct principles laid down : 1. That the owner has a right to navigate from his dock. 2. That the state has the right to regulate the navigation of the river, even when it affects the mode in which that right is to be exercised. And a third, to be drawn by implication, that the state has not the power to take away the right, but only to regulate its exercise.

The power of the state to regulate the use, by the public, of highways, either on land or water, is conceded. Where a fresh water river, above tide, is navigable, it is often a public highway, though the title of the bed is in the adjoining owners ; the right of the state to regulate the navigation may be admitted, while it cannot cut off the owner or affect his title to the soil.

There is nothing in the decision of the Court of Errors, or in the opinions, to present a different view of the case, except the remark in the opinion of Chancellor Walworth that "the legislature might authorize erections in front thereof, [the plaintiff's wharf] as in the case of Smith's wharf, on the

Thames," referring to the case of *Rex* v. *Smith, Doug.* 425, evidently founding this *dictum* on that case, without reflecting that it was based on the omnipotent power of parliament. Gould's case thus stands by itself; it is entitled to the respect which belongs to the character and learning of the judges of the majority who decided it.

The decision in *Bailey* v. *Phil., Wil. & Balt. R. R. Co.*, 4 *Harrington* 389, is only upon the right of the state to place over a navigable stream a bridge without a draw, that affected all wharves above it alike. This is the right to regulate the use of the stream by the public, the same point as adjudged in *Lansing* v. *Smith.*

The right of the state over the artificial highways laid out or constructed by its authority, would seem to be clear on principle; they are not privileges belonging to land from its natural situation, but provided by legal regulations which contain provision for the vacation of these very ways. Yet there is much force in the reasoning of Justice McLean, in delivering the opinion of the court in *New Orleans* v. *The United States*, 10 *Pet.* 720, where he declares that the sovereign power cannot close the streets of a city or deprive the inhabitants of their use, because such use is essential to the enjoyment of urban property. And if, for the purpose of raising funds for the public or municipal treasury, the legislature should provide that the streets in any of our large cities should be vacated and the land sold, or a few feet in front of each house sold to a stranger, the courts would find some principle upon which such an imposition could be prevented.

The right on the principles of the common law which I for convenience call the right of adjacency, consists in the right of ferriage, of landing boats alongside a wharf, or land by the shore, and unloading goods upon or taking them from it, the right of fishing from the shore, and drawing nets upon it, of entering upon it from the land, for bathing or procuring water, and such other benefits as can be en--

joyed only by the adjoining owner, peculiar to him, and not common to the rest of the public.

These rights, founded upon the same principles as those before mentioned—settled principles of the common law—and thus supported by natural principles of justice, have, together with the right of wharfing out peculiar to New Jersey, been recognized as rights by so many learned and able judges that they are entitled to be considered as settled, although there is no case in which it was the matter decided. In the case of *Bell* v. *Gough*, in this court, Judges Potts, Ogden, and Nevius, in their opinions, expressly state this to be the law; in that cause, when in the Supreme Court, Chief Justice Green, (2 *Zab.* 462,) states that in the soil of navigable rivers below high water mark, there has undoubtedly existed from a very early period rights of the riparian proprietors, which have been recognized by the legislature, inconsistent with the idea of that exclusive property in the state recognized by the common law.

On the trial of the case of *Bell* v. *Coles*, in which I was counsel, Judge Grier, upon the entry of the verdict, said in open court that the judgment would give the plaintiff possession, but it must not be considered as entitling her to cut off the access of the defendants to the water, or to fill up the land, and signified his opinion that the recovery might be of no value to her unless profit could be made out of the premises as they were. These observations were so decided, that the counsel of the plaintiff advised her that although she owned the lands under water, it was necessary for her to purchase the right to fill in of the defendants, before she could proceed. And in consequence of this, before the exceptions taken by the defendants were drawn or sealed, a negotiation was begun, the result of which was, that a strip of land along the shore was purchased of the Coles family by Mrs. Bell. This fact is mentioned, as there is no full report of the case to show that this declaration of Judge Grier was regarded, and had effect at the time. His

opinion, as far as it is of value, was in favor of rights of adjacency.

The opinion of Judge McLean, in *Bowman's Lessee* v. *Wathen*, 2 *McLean* 376, is clearly and decidedly in favor of such rights. And in the opinion delivered in this court in *Barnett* v. *Johnson*, 2 *McCarter* 489, Justice Vredenburgh, in speaking of similar rights, claimed in that case by adjacency to a canal, says "that a right so esssential, so universal in its exercise in all time and among all nations, exists, not as was said in *Gough* v. *Bell*, by a common law local to New Jersey, but by a law common to the whole civilized world."

But whatever might be the common law of England, the law of this state, as recognized for more than a century by successive legislatures, by the courts, judges, and state officials, has established these rights of adjacency, including that of reclaiming lands under water, as a right of the shore-owner.

The legislature have recognized this right in a number of special acts for shutting out the tides. I have found forty acts of this kind of the colonial legislature, and more than thirty of the state legislature before the new constitution. All of these provide for shutting out the tides, and of course include the shore as part of the land to be reclaimed. A number of them expressly provide for the lands between ordinary high and low water, and the creeks, on which the marshes provided for in most of them lay, are navigable waters; several of these tracts are on the shores of the Delaware, and Delaware bay. The declared object is to improve and reclaim meadows and marsh lands overflowed by the tide, and this marsh includes the shore.

All these acts, including that of February 10th, 1711, to stop the tides in the creek around Burlington islands, said to be the first private act of the colonial legislature, mention the persons benefited as the owners of these marshes.

The first general act to improve tide swamps and marshes, passed November 29th, 1788,* in its first line, mentions the *owners* of marsh or swamp exposed to the overflow of the

*Rev., p. 642.*

tide and capable of being laid dry. The proviso to the first section declares that no navigable water should be stopped, the use of which, by the public, would be of half the value of the improvement. The banks authorized are such as are necessary to secure the marsh from the overflow of the tide. The fifth section provides for the survey and valuation of the lots belonging to each owner, *usually* overflowed by the tide, for the purpose of assessing the expenses. The whole act unmistakably shows the object to be to provide for lands on navigable streams and elsewhere, usually overflowed by the tide; these lands constitute the shore, and this shore is treated and considered as owned by individuals, and they are made liable to the expenses of the enterprise. The various supplements to this act, which is itself in force, extending down to 1855, are to the same effect. The legislature have thus for one hundred and forty years acknowledged a right in the shore by owners of adjoining lands. Perhaps the recognition was founded on the idea that they owned the fee to low water mark, now held to be a mistake, but the right is admitted.

The series of acts regulating fisheries on the Delaware, commencing with that of December 24th, 1784, (*Pamph. Laws* 179,) to the act of 1808,* with its supplements, still in force, all acknowledge property in these fisheries by protecting the interests or claims of those who are styled owners of the fisheries. They protect these owners in the almost exclusive enjoyment of these rights in front of their lands, between lines drawn at right angles to the shore.

Fisheries were devised by wills and conveyed by deeds, and the courts sustained actions of ejectment for them. Yet there had been no actual grant of them by the state.

The *dicta* in *Gough* v. *Bell* go far enough in disregarding such repeated, continued, and consistent legislation. But the decision of that cause is not adverse to these rights; it is founded on them. And the opinions of the judges, regarded as establishing the right of the state to the fee, are not inconsistent with them, but expressly acknowledge them.

---

*Rev., p. 426.

They recognize the right to reclaim, which, if absolute, is almost equivalent to the ownership acknowledged by this legislation. We are now asked to go far beyond this, and hold that this legislation is to be disregarded by the courts in establishing the law in the state—a position which seems to me to have no parallel in the history of jurisprudence. Continued legislative recognition of no doubtful character for a century and a half, is to be set aside upon the divided opinions of courts of other states, whose judges are not familiar with our law, even were they the most learned in there own.

The people of the state had claimed and exercised the right of building wharves in front of their lands from the earliest times, and until the suit in the Circuit Court of the United States brought by *Waddell's Lessee* v. *Martin*, for the purpose of testing the rights of the proprietors of East Jersey to the lands under water, I find no law or private act to authorize the building of wharves. Chief Justice Kirkpatrick had declared in 1821, in his opinion at circuit in *Arnold* v. *Mundy*, 1 *Halst.* 10, that " the intermediate space between the high water and low water mark may be exclusively appropriated by the owners of the adjacent land by building thereon docks, wharves, store-houses, salt-pans, or other structures which exclude the re-flow of the water." Upon this, no doubt, the practice was continued with confidence, notwithstanding the title to lands under water was, by the decision at bar, settled to be in the state.

In 1834 the East Jersey proprietors made a lease to Waddell for the purpose of establishing their right to the said soil under tide waters ; and then the conflicting claims of the state and the proprietors drew the attention of the public; and the purchasers of the claim in Harsimus Cove of Nathaniel Budd, who derived title from these proprietors, one of these purchasers being Willis Hall, the former attorney-general of New York, demanded of Budd that he should procure the title of the state. This he obtained by the passage of the act of 1836, granting it to him. The

case of *Waddell's Lessee* v. *Martin* was tried in the United States Circuit Court in October, 1837, and under the charge of Judge Baldwin, a verdict was rendered for the plaintiff. The state taking from Martin the burthen of this litigation, caused this suit to be removed to the Supreme Court, on exceptions to the charge, and the result was the decision of that court in June, 1842, by which the judgment below was reversed, and the right of the state to the lands under the tide waters established, as it had been before in the state courts, in the case of *Arnold* v. *Mundy.* But the decisions and opinions in both these cases only established that right as to lands below low water mark, and decided nothing as to the shore. From this time, frequent applications were made to the legislature by riparian owners for leave to build wharves and reclaim and appropriate the shore and lands under water in front of their shore line.

Mrs. Bell, who, by purchase at a foreclosure sale, had acquired the right of her father, Nathaniel Budd, to the tract which he held, both under the proprietors and the state, laid claim to and entered upon a part of that tract, originally part of the shore, but which the Coles family, the riparian proprietors, had filled in before the act of 1836, by which the state granted it to Budd. The suit brought by Gough, the tenant of the Coles family, brought in question the right of the riparian proprietors in the shore as against the state. The first decision of that case in the Supreme Court in July, 1847, (1 *Zab.* 156,) set aside the verdict for the defendant, on the ground that the title of the state was to high water mark, and had passed by the act of 1836. After a second trial, the case was argued before the Supreme Court on a special verdict, and the decision given in July, 1850, was for the plaintiff, on the ground that, in this state, by a principle established by continued custom, approved by the legislature and the courts, the riparian owner had a right to fill in and reclaim the shore in front of his lands, and to appropriate the land so reclaimed. And the Court of Errors, to which the cause was removed in June, 1852,

affirmed this decision on substantially the same grounds. In all these decisions it was held by the courts that, by the common law, the state owned the fee of the shore, and that the right to reclaim and appropriate was based upon a change in the common law, made like many changes which have been made, to adapt it to the condition and circumstances of the people.

This change of the common law was shown by the common and universal impression among the people and of the bar and of the courts, and more especially by the frequent and repeated admission by the legislature in their acts for more than a century. A single admission or mistaken recital made by the legislature of an erroneous principle as law, will not make it such, but a continued series of admissions for a century by successive legislatures, with no declaration to the contrary, may well be held to work a change of the law as effectually as a statute passed by the same body. It has the power to change the law, and the will of the sovereign power thus plainly manifested, is law.

But the judges in expressing their opinions in this case, although unanimous, or nearly so, in the decision of the case, were divided in limiting the extent of the right of the riparian owner. All admit a right of the owner in the shore to some extent; some state it as a right vested in the owner as property; others speak of it as existing during the acquiescence of the state. The Chief Justice, and Justices Elmer, Carpenter, Nevius, Potts, and Ogden, all hold that by a local common law established in New Jersey, the riparian owner had acquired rights different from those he held at the common law. This was the view of every justice of the Supreme Court, except Justice Randolph.

The counsel for the state, in the argument in the Supreme Court of the United States, in *Martin* v. *Waddell's Lessee,* stated that it was an established custom in the state for the riparian owner to wharf out. And the boundary commissioners of 1807, consisting of Aaron Ogden, Alexander C. McWhortor, William S. Pennington, James Parker, and

Lewis Condict, some of them eminent lawyers, all thoroughly versed in the history and customs of the state, in their correspondence with the commissioners of New York, quote, with approbation, the position of Judge Swift on this point. They state that it accords with the usage and common understanding of the people of the United States. Swift, in this quotation, holds "that the owner has the exclusive right of wharfing and erecting piers in front of his lands on navigable waters, and that no man has a right to do any act in front of another's land which can affect the soil, as wharfing or erecting piers, for in this there is an exclusive property." And although this would seem to include the right of the soil which, since *Bell* v. *Gough*, has been held to be in the state, yet it shows the view of these commissioners as to the usage and common understanding in New Jersey. In Massachusetts, Maine, and Connecticut, the rule is established that the riparian owner may reclaim the shore in front of him; in Massachusetts this is said to be founded on the ordinance of 1641; but since that ordinance ceased to be in force, which was more than two centuries ago, the same rule has been adhered to by the courts as the law of that state, because in accordance with the spirit of that ordinance and the opinions and circumstances of the people.

For these reasons, it is clear to me that this right of wharfing out and reclaiming did not depend upon the mere acquiescence or silence of the state. Some of the judges named above have, in their carefully-guarded opinions, coupled it with that acquiescence, without stating that the right depended upon it. All speak of it as a *right*, and a right or property is inconsistent with the idea of acts done by permission, whether by acquiescence or otherwise. And the courts of this state should not now, by adding such an inconsistency to the discordant opinions of its judges on this matter of riparian rights, give force to the sarcasms of Justice Grier. The opinion of Judge Elmer, in *The State* v. *Jersey City*, 1 *Dutcher* 525, while it sustains the assessment, on the ground that the assessors had the right to assess the

value of a strip of land along the shore five feet wide, itself worthless, by adding to it the value of the *right* to reclaim, says that the right may be taken away by the state at any time before it is exercised.    There is no reason to believe that the other members of the court who concurred in the judgment sustaining the assessment assented to this view.    It is like holding that a guest invited to stay at the house of a friend until informed that it was no longer convenient, had a right in the house that was property, and liable to taxation, if the assessor came around in the interval.

For these reasons I am of opinion that, independent of the rights by adjacency recognized in the principles of the common law and the *jus gentium*, and independent of the wharf act, the riparian owner in New Jersey has, by the principles established by the acknowledgment of successive legislatures, of her jurists and courts, and the general and settled opinion of the citizens, the right to wharf out in front of his lands without the permission of the legislature, provided he does not interfere with the rights of others or the public right of navigation in the river, and that this right is property.

This right is also claimed to be annexed to the land as an incident, by the wharf act of 1851.*    The question on that act is, whether it annexed the right as an incident to the estate, or whether it was enacted as a general law to regulate the filling in until altered or repealed by the legislature.

It is a clear principle that where the common law has annexed to property, as an incident, a privilege or right which constitutes part of its value, that incident cannot be taken away by a change or repeal of the law.    For example, the common law vests in the grantee of one hundred acres of the surface of the soil, the right to all below it, including fountains of water and oil, minerals and metals, except gold and silver, also the exclusive right to occupy the space above it *usque ad cœlum.*    No general or special act could give to a stranger the oil wells, the coal beds, or iron or lead ores below the surface, or to the owner of two lots in a city separated by the lot of such stranger the right to erect a building

* *Rev.*, p. 1240.

twenty feet above the surface of the part of the intervening lot not built upon, even if the building is supported upon the lands on each side, and at no point rests upon or touches this lot. Yet the rights to the space above and all below rests upon the *lex loci rei sitæ*, which, before the rights were vested, could have provided that the minerals and oil springs in all lands granted should remain subject to the disposition of the government. But not only by the common law, but by the principles of universal law common to all civilized nations, known as the *jus gentium*, these rights above and below pass to the grantee, unless excepted by general law or special provision; they are part of the property, and as sacred as any other part of it. The right to the flow of fresh water streams is property, whether claimed for water power or for purposes of irrigation, or domestic or agricultural use. These cannot be taken away and given to an individual, or appropriated and sold by the state for replenishing the treasury, or even by a general law declaring that the mines and minerals below the surface or the vacant space above it, should not belong to the owner of the surface until he purchased them of the state.

There can be no difference in this respect whether these incidents are annexed to the subject matter by the provision of the common law or by statute. Both are equally law, and only of force while law. The common law is in force by statutory enactment, at any time repealable.

If, with the other principles of the common law brought into this state, the rule in England that the gold and silver mines (which, as royalties, were the king's) did not belong to the owner of the soil, and the legislature, to free the people from these last vestiges of feudal or kingly oppression, had declared that these mines should belong to the owner, they would vest in him as part of his freehold, and could not be taken from him any more than his coal beds, or than the rights of wardship and primer seizin and other feudal rights could be revived and claimed as in the state, by repeal of the law abolishing them. In England, these things could be

accomplished by the omnipotence of parliament, but not in a free government, where the right of sovereign to take from the subject is limited and restrained.

The rights to minerals, to use water power, and to occupy the space above lands by buildings upon them, might be in some measure modified by laws passed for the professed purpose of regulating their use, and requiring payment to the state for licenses for such purposes; but if such payments were exacted as showed they were not for the purpose of enforcing proper police regulations, but for forfeiting the property to the state under this pretence, it would never be permitted.

The only question, then, is, did the wharf act of 1851 annex to lands along the shore the right to reclaim the shore in front of them, and vest this right in the owners as property? This act was passed at the next session of the legislature, after the second decision of the Supreme Court, in *Gough* v. *Bell,* which was in July, 1850, and before the final determination of that case in the Court of Errors, in July, 1852. The general opinion of the people and of the profession throughout the state had been disturbed by that decision, modified as it was, to preserve the rights of the plaintiff. The fair inference to be drawn from the history of the claims of the riparian owner, and of the legislation and controversies relating to them, and from the language and provisions of the act itself, is, that it was passed to settle these controversies for the future, and to insure to the owner those rights in the shore which it had been supposed were vested in him, securing to the public the use of the shore until actually reclaimed, and to vest in a local board, at that time one of the most competent and pure in the state, the power of determining in each case whether any wharfing beyond the shore would injure navigation. The public records show that the leading counsel of Gough was a member of the senate, and that the act was introduced in that body and carried through by myself. But I hold that the intention and object of a legislator, or the draftsman of a law,

gathered from other sources than the law itself or legislation on the same subject, ought not to be considered in the construction of an act. The law must be construed in the sense which it conveys to those whose rights and duties are to be controlled and governed by it ; they are to regard the language in which it is promulgated to them. The secret or individual intention of the legislator, which, from want of candor or of skill in expressing it, is not promulgated, is no binding part of the law. This must be the rule in every government that regards the rights of the subject, especially in a free or representative government; in an absolute or despotic monarchy, the real intention of the sovereign will be looked for by his sycophants as of more importance than the rights of his subjects.

It cannot be reasonably supposed that in the situation of the unsettled opinion of the courts as to riparian rights, the object of the legislation was, in this stage of the controversy, to pass an act which should *seem* to settle these rights, and yet by fixing no rights, to leave it open, not only in the courts, but to future changes in legislation—in other words, to confer rights only until the next session of the legislature. It was not intended to settle the controversy in the suit then pending ; no legislation could divest the right then vested in the Coles family, or affect the grant of lands under water made to Budd, or the right conferred upon the Associates of the Jersey Company to reclaim in front of Poules Hook, even without the proviso introduced, to except those grants.

The words used in the act are such as are usual and proper to declare the law on the subject matter, and adapted to confirm or alter it, whichever was intended. If the law was settled that the shore-owner had the right to reclaim absolutely, the words were proper to confirm that; if settled that he had such right until interfered with by the state, the words were proper to confirm that right, and to alter the law by abolishing the restriction, which was done by declaring absolutely, without annexing such restriction, that it was lawful for him to do it. The intention to make this right

on the shore absolute is rendered more clear by the requirement of license for filling in lands below low water mark.

When a right is conferred by general law, it is not usual or proper to use words of grant such as are used in deeds. But words are used such as are proper to create, confirm, or change the rule of law, and such are used here. They are the same words that are used in many acts where the object, or rather the effect, to be produced was to confer a right of property. In the two great monopolies that have attracted most attention in this state—the bridges over the Passaic and Hackensack and the Joint Railroad and Canal Companies—the right was created by the words "it shall not be lawful," the correlative of the words here. And as to the bridge company, these words have been held both in this court and the Supreme Court of the United States, to vest rights as property not to be taken away by repeal. And although that court, in *Rundle* v. *The Delaware and Raritan Canal Company*, 14 *How.* 80, founded its judgment upon the case of *The Monongahela Navigation Company* v. *Coons*, 6 *W. & S.* 101, and *The Susquehanna Canal Company* v. *Wright*, 9 *W. & S.* 9, which hold that a license granted by the state may at any time be revoked and repealed, yet they remark "that the principles asserted in these cases are peculiar, but, as they affect rights to real property in the state of Pennsylvania, they must be treated as binding precedents in this court." From which it must be inferred that such principles would not have been recognized unless forced upon that court by the highest courts of Pennsylvania.

In twelve private acts passed in the four years between 1845 and 1850, the right to wharf out is granted to individuals by the same words, and in three acts by the words "are authorized and empowered." In seven private wharf acts passed by the legislature of 1851, concurrently with the wharf act, the words used are, "it shall be lawful." Yet no one can doubt but that these acts were intended to vest,

and did vest, a right, and, if they did, it cannot be taken away by repeal.

The right to reclaim the shore is granted by the first section, consisting of four lines; no other part of the act, save the exception in the eighth section, relates to the shore. It is a single declaration that it is lawful for the shore-owner to reclaim the shore, and, when reclaimed, to appropriate it to his exclusive use; it went at once into effect, without condition or limitation.

The second section gives the right to reclaim below low water. It does this by exactly the same words—"it shall be lawful." To these words in this section a construction is given by the provision in the eighth section that nothing in the act contained should prevent the state from appropriating to public use lands lying under water, in the same manner as if that act had not been passed. This proviso has no signification if the second section did not, without it, vest a right beyond legislation. It demonstrates that the legislature understood and intended that the words "it shall be lawful," as used in the first and second sections, should vest a right beyond recall, without this provision for the case in which these lands under water should be needed for public use; they did not intend a grant or gift by which the state should be compelled to pay for these lands, if taken before money had been expended for improvements thereon. And although this provision does not apply to the shore, as it regards only "lands under water," carefully distinguished from the shore, in the first part of this section, yet it demonstrates what was understood and intended by the words "it shall be lawful." The act was so understood by landholders and the public. In every locality where the shore was of value, strips of land adjoining the shore were sold at prices founded upon the value of the right conferred, and which never would have been paid for a revocable permission.

If the lands taken by the defendants had been below low water instead of on the shore, the provision in the eighth

section would have taken them out of any right granted by the wharf act. It is well settled that whatever right the state may have in taking lands for public uses, it may delegate to any person or corporation authorized to construct works intended for public use.

The conclusions to which I have arrived are these:

1. That the owner of lands upon tide-waters has a right to the natural advantages conferred on his land by its adjacency to the water, which, like the right to have fresh water streams flow unobstructed and unpolluted upon and from his land, and like the right to support for the natural soil by the adjacent soil, is an incident to the land, and is property.

2. That by the law of New Jersey, being the common law as adopted here, altered to suit the circumstances and necessities of the people and the genius of our government, the right to wharf out from the lands situate on tide waters over the shore in front, has become an incident to such lands and a right of property.

3. That by the wharf act of 1851, the right to fill in and appropriate the shore is conferred upon the shore owner as an incident to his property.

Lastly. That all these rights, being incidents to an estate which add to its value, are property, and cannot be taken away by general or special legislation, except by the power of eminent domain for public use and upon compensation.

It was thereupon ordered by the court that the vote be taken separately on the two points involved.

The first of those questions was, whether the legislature had the power to grant to the defendants in error (in the court below) the use of the premises in question, being lands in a navigable river below high water mark.

In order to express, with precision, the views of the members of the court, it was determined that those who voted in the affirmative on this first point, should express a concurrence in the view contained in the opinion of the Chief Jus-

tice, and those voting in the negative, in the view contained in the opinion of the Chancellor.

The vote was then taken on this first point in this mode, and resulted as follows, viz. :

*For concurrence with the Chief Justice*—THE CHIEF JUS-TICE, Justices BEDLE, SCUDDER, VAN SYCKEL, and WOOD-HULL, Judges KENNEDY, OLDEN, VAIL, and WALES.   9.

*For concurrence with the Chancellor*—THE CHANCELLOR, and Judges CLEMENT and OGDEN.   3.

The second question was then put, which was, whether the legislature had, in point of fact, granted to the plaintiffs in error the right to the use of the premises in question ; those members who denied the existence of such grant voting to affirm, those of a contrary opinion to reverse.

The vote resulted as follows :

*For affirmance*—THE CHANCELLOR, THE CHIEF JUSTICE, Justices BEDLE, DALRIMPLE, SCUDDER, VAN SYCKEL, WOOD-HULL, Judges CLEMENT, OGDEN, OLDEN, VAIL, WALES.   12.

*For reversal*—Judge KENNEDY.   1.

Judgment was thereupon entered in the following form :

" This cause coming on to be heard at the term of June, 1870, of this court, in the presence of Cortlandt Parker and A. Q. Keasbey, Esqs., of counsel with the plaintiffs in error, and of Frederick T. Frelinghuysen, Jacob Vanatta, and Gustavus N. Abeel, of counsel with defendant in error, and the record and proceedings having been read and examined and counsel heard thereon, and the court having inspected said record and proceedings, and it appearing to the court that there is no error in the said record and proceedings, but that the judgment of the Circuit Court should be affirmed—

" It is, on this 5th day of December, in the year 1870, or-

dered, adjudged, and decreed, that the judgment of the said Circuit Court of Essex county, in the above cause given, be in all things affirmed, with costs, and that the record be remitted to said Circuit Court, to be therein proceeded on according to law and the practice of said court.

"On motion of

"G. N. ABEEL,
"*Attorney of defendant in error.*"

CITED *in Paul* v. *Hazelton*, 8 *Vr.* 107; *Wooley* v. *Campbell*, 8 *Vr.* 168; *Pennsylvania R. R. Co.* v. *N. Y. and Long Branch R. R. Co.*, 8 *C. E. Gr.* 159; *Attorney-General* v. *Hudson Tunnel R. R. Co.*, 12 *C. E. Gr.* 183.