33 N.J. Super. 344 (1954)
110 A.2d 157
FREDERICK A. BRINDLEY, PLAINTIFF,
v.
BOROUGH OF LAVALLETTE, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided December 6, 1954.
*347 Mr. Aristo Dallavalle, attorney for the plaintiff.
Mr. Percy Camp, of Camp & Simmons, attorney for the defendant.
LARRABEE, J.C.C. (temporarily assigned).
Plaintiffs sue to test the legality of Ordinance No. 166 adopted by the Borough of Lavallette to establish and regulate a paid bathing beach on the ocean front and the respective rights of the plaintiffs and the borough in the ocean front area.
The plaintiffs include Frederick A. Brindley, George F. Hoffman, Walter H. Purdy and Gertrude Purdy, who own residences in Lavallette which face the beach front, and also 72 other plaintiffs who are residents of Lavallette or own real estate in Lavallette not on the beach front. The Borough of Lavallette is the defendant.
The plaintiffs seek a determination that:
(a) The Borough of Lavallette is not the owner of the lands bordering the Atlantic Ocean.
(b) That title to the ripa maris is in the State.
(c) That plaintiff Frederick A. Brindley is the owner of the beach front adjoining his premises, and that his title extends to the easterly side of Ocean Avenue.
(d) That the titles of plaintiffs Brindley, Purdy and Hoffman, which properties abut Ocean Avenue, extend to high water mark and that they are thereby entitled to the incidents of riparian ownership on tidal waters.
*348 (e) The ordinance does or does not apply to plaintiffs and members of their families using the ocean front for beach and bathing purposes.
(f) The ordinance is illegal in that it deprives plaintiffs of their property rights in violation of the Fourteenth Amendment of the Constitution of the United States, and of Article I of the Constitution of the State of New Jersey.
(g) Money damages and such other relief as may be just.
The ordinance is void because it is discriminatory.
The ordinance provides that no one over the age of 12 shall use any of the facilities of the bathing beach without first having paid the proper fees therefor, which are as follows:
(a) $3 per season, per person, for real property owners, members of families of real property owners, and persons who have rented properties during 1954, or who shall, during that year, rent properties in the borough for a period of five consecutive weeks or longer; and the members of their immediate families; or
(b) $1 per week or lesser period per person for all residents of the Borough of Lavallette, either as owners of real estate, residents of cottages or registered guests at hotels or boarding houses and members of their families;
(c) Persons not falling within the classifications defined in paragraphs (a) or (b) above shall not receive any license whatsoever.
(d) Children under the age of 12 years, who are residents either temporary or permanent in the Borough, shall not be required to pay any fee.
The ordinance is invalid because it discriminates against non-residents. The 1950 act, N.J.S.A. 40:92-7.1, gives the borough power to regulate, but as stated by Justice Scudder in Morgan v. City of Orange, 50 N.J.L. 389 (Sup. Ct. 1888),
"distinctions between inhabitants of our state, based upon no other ground than the place of actual residence, are in restraint of trade, invidious, unjust, and illegal. Ordinances passed in the exercise *349 of a police power to control the sale of articles within a town or city, and in other matters, must be reasonable."
In Nutley v. Brandt, 12 N.J. Misc. 670 (Sup. Ct. 1934), Justice Case applied the rule to invalidate an ordinance requiring non-residents of the municipality to obtain a permit to distribute circulars and pointed out that although the rule had often been applied to invalidate ordinances adopted under the taxing power, Justice Scudder's statement extended it to the police powers and other matters.
In Jersey City v. Chasan, 81 N.J.L. 315 (Sup. Ct. 1911), it was held unreasonable to require drivers of horse-drawn vehicles in Jersey City to obtain a permit, none being required of three-month residents, and Justice Bergen held the ordinance void for discrimination.
Thus the law is settled that discrimination against non-residents in an ordinance invalidates it, excepting possible special circumstances which would justify the discrimination. No such special circumstances have been shown and Ordinance No. 166 is accordingly declared void.
There are other issues, factual and legal to be determined.
On October 9, 1877 Isaac D. Guyer et ux. sold to the Barnegat Land and Improvement Company, three tracts totalling 466.51 acres of which the first tract includes the area which is now the Borough of Lavallette. The beginning point of said first tract is located, at its southwesterly corner, at the edge of a small creek or thoroughfare that separates what is known as the "Dry Flats" from the main beach and from there it runs as the magnetic needle pointed January 27, 1876.
"(1) along the North line of Michael W. Ortley's land South sixty five degrees fifteen minutes East forty seven chains and ninety four links to the sea; thence (2) Northerly along the sea at low water mark one hundred four chains and seventy eight links to the Southeast corner of a tract of land quit claimed to William H. Miller and Sarah A. his wife; thence (3) along said Miller's south line fifty chains, more or less, to the beginning and Southwest corner of Miller's land; thence (4) Southerly following the bay and several courses South * * * to the BEGINNING."
*350 The Barnegat Land and Improvement Company laid the tract out as a real estate development, and on February 21, 1878 a map was filed in the Ocean County Clerks Office entitled, "Map of Lavallette City by the Sea, Squan Beach, Ocean County, N.J., Fowler & Lummis, C.E. 436 Walnut Street, Phila. Pa." On September 1, 1890 a map entitled "Plan of Lavallette City by the Sea, Ocean County, N.J." bearing no date was filed in the Ocean County Clerk's Office.
Both maps show an area designated as "Ocean Avenue" extending from the north end to the south end of the borough, 100 feet wide and lying west of an unmarked area on the east, which in turn borders on the ocean's edge. West of the area marked "Ocean Avenue" the land is divided into lots and avenues.
There are 24 parallel avenues in the borough which extend Westerly from Ocean Avenue to or toward the bay front. White Avenue is the second and Kerr is the third avenue from the north line of the borough. New Brunswick is the fifteenth and Virginia is the sixteenth avenue from the north line of the borough.
The lots owned by Brindley are lot No. 3 and the northerly rear half of Lot No. 6, Block 2 Section A. George F. Hoffman owns lot No. 1 and the northerly half of Lot No. 5, Block 2, Section A. Purdys own Lot No. 3, Block No. 4 Section C.
Brindley's premises front 50 feet on Ocean Avenue by 150 feet deep and are 50 feet north of Kerr Avenue.
Hoffman's premises front 50 feet on Ocean Avenue by 150 feet deep on the south side of White Avenue.
Purdys' premises front 50 feet on Ocean Avenue by 100 feet deep and are 50 feet north of Virginia Avenue and 100 feet south of New Brunswick Avenue.
The Barnegat Land and Improvement Company proceeded to sell lots at Lavallette, and the deed made by the corporation to Lennon dated March 25, 1886, in describing the premises thereby conveyed, which included the Brindley and Hoffman lots, referred to "A Plan of Lots of the Barnegat Land and Improvement Company made by Fowler & Lummis, C.E., *351 A.D. 1878 duly filed in the Clerk's Office of the County of Ocean aforesaid." This description is not identical with the title on the map itself, but it does describe the map filed in the Ocean County Clerks Office in 1878, and this was the only map so filed that would answer the description used in the deeds. The description binds the premises on the westerly side of Ocean Avenue.
Where the owner of urban property, who has it laid off in lots, with streets, avenues and alleys intersecting it, sells his lots with reference to a plot on which the property is so laid off, or where, there being a city map on which the land is so laid off, he adopts that map, by sales with reference thereto, his acts will amount to a dedication of the designated streets, avenues and alleys to the public. Clark v. City of Elizabeth, 40 N.J.L. 172 (E. & A. 1878). Conveyances of lots bounded on a street owned by the grantor dedicates the street. State of New Jersey v. Bayonne, 52 N.J.L. 503 (Sup. Ct. 1890).
Therefore, Ocean Avenue is dedicated but there has been no formal acceptance by the Borough. Plaintiffs contend that there has been an acceptance by the public but the evidence consisted largely in references to the area as Ocean Avenue. Acceptance by public user would need to be user for the express purposes for which it was dedicated, but the proof offered was that the term Ocean Avenue was used as a residential address by those residing on the beach front; that the county had erected some concrete street markers on which the words "Ocean Avenue" appeared; that deeds and other papers referred to Ocean Avenue; that beach buggies, which travel on the wet, hard-packed sand, and at times wagons bearing driftwood used the area; that fishermen's boats had been beached on the area; that one lot owner had carried building supplies over the boardwalk by vehicle; that a boardwalk had been maintained on the westerly side of the area for many years and used as a promenade by the public, but not by vehicular traffic, the common use of roads and streets. Plaintiff submitted other evidence of a similar nature that fell short of establishing acceptance by public user in accordance *352 with the intended purposes of a street. The witnesses for the defendant flatly denied that the area had been customarily referred to as Ocean Avenue. They asserted that the area, with rare exception, was referred to as the beach front, not Ocean Avenue. The public generally was not aware that Ocean Avenue existed even as a paper street.
Public user, to constitute acceptance, must be unequivocal. State, New York and L.B.R.R. Co. v. South Amboy, 57 N.J.L. 252, 253 (Sup. Ct. 1894); Arnold v. Orange, 73 N.J. Eq. 280, 281 (Ch. 1907). And to constitute acceptance of a street it would need to consist of normal street uses. The area was not used as a street because it was covered by beach sand and sand dunes and could not be used by ordinary vehicles. Beach buggies travelled along the litus maris. They need to speed up to cross the dry sand which covers the Ocean Avenue area. The area was used for many years as an accessory to fishing and bathing, for beach parties, playing games, fireworks and other recreational purposes. The boardwalk was first erected by the borough in 1908 and extended in 1915. The borough posted lifeguards on the area beginning in 1919. Fishing and bathing by the general public were current throughout the years. Thus the user has been as a recreational area, not as a street.
No formal acceptance by the borough was proved. Consequently, the area is subject to a dedication from which the owner-developer or its grantees cannot withdraw, and which the municipality may formally accept if and when it desires to act. Darling v. Jersey City, 73 N.J. Eq. 318 (Ch. 1907).
Further, plaintiffs Brindley, Hoffman and Purdy contend that they own the fee of the area in front of their lots. They do own the fee to the westerly part of Ocean Avenue from the center line of Ocean Avenue to their respective property lines, subject however, to the rights of the borough hereafter discussed. In Salter v. Jonas, 39 N.J.L. 469 (E. & A. 1877), it was held that a conveyance of lands abutting on a street which binds the land on the street, conveys the *353 grantor's title to the center of the street unless express words of exclusion are used in the conveyance.
Brindley's and Hoffman's rights were created by the deed from the Barnegat Land and Improvement Company to one Lennon, dated March 25, 1886 and recorded in the Ocean County Clerk's Office in Book 142 of Deeds, pages 362, etc. This deed refers to the 1878 map which shows a sizeable area of land east of the area designated as Ocean Avenue. Thus the Barnegat Land and Improvement Company granted to Lennon, by construction, only the westerly half of the Ocean Avenue area, not the entire width of the street.
Purdy's right was created by a deed from the Barnegat Land and Improvement Company to one E. Taylor Lewis, dated August 8, 1878 which referred to the filed map but did not otherwise bind the premises on Ocean Avenue.
In Salter v. Jonas the court said,
"so if the abutting street referred to in a conveyance should be such only in contemplation and should be contingent on the will of the vendor, the rule now adopted might not and probably would not be applicable. But where * * * by the effect of his conveyance he imposes upon himself the obligation to devote the street to public uses, the rule becomes the criterion by which the sense of the deed is to be ascertained."
The rule in Salter v. Jonas expressly applies to the Brindley and Hoffman properties, but it also applies to the Purdy property because the developer dedicated the street by references in the Taylor deed to the filed map on which Ocean Avenue appears, and so imposed upon itself an obligation to devote the street to public uses and made applicable the rule as a criterion in construing the deed.
Defendant, citing Darling v. Jersey City, 73 N.J. Eq. 318 and Schmidt v. Spaeth, 82 N.J.L. 575 (E. & A. 1912), contends that no title vests in the adjoining lot owner under the rule in Salter v. Jonas until acceptance by the municipality or by the general public.
In the Darling case, Vice-Chancellor Howell said,
"I understand the law to be that a tender of a dedication cannot be revoked (Hohokus v. Erie Railroad, 65 N.J.L. 353); that it *354 may be accepted by the municipality at any time; but that, until the tender has been accepted and the dedication has ripened into a public right and a public obligation, the fee simple title and the control of the property remain in the dedicator, and he may use it as he will, provided he does not in any way interfere with the right of the public to accept the dedication whenever it sees fit to do so. DeGroot v. Jersey City, 55 N.J.L. 120; Pease v. Patterson & State Line Traction Company, 69 N.J.L. 165."
But the dedicator in the Darling case had title to the roadbed as against the lot purchasers and the City of Jersey City by reason of a decree quieting title by which they were bound. The court granted an injunction against the defendant city on the ground that the complainant owned the fee, therefore the city had no right. But the court also based its decision on the absence of an acceptance of the dedication and the presumption of title in the dedicator raised by the deed through which he acquired title.
Consequently, the time when the rule in Salter v. Jonas operates was only one of a number of issues upon which the court rested its decision.
In the DeGroot case and the Pease case, supra, cited by the vice-chancellor as his authority, there is no indication of a sale by the dedicator of lots bounded on a street that would transfer title to the street under the rule in Salter v. Jonas. It would not be inconsistent with the recited facts in these cases to assume that the dedicator, or his grantee, owned both the roadbed and the lots adjoining it at the time of suit.
Schmidt v. Spaeth, supra, in which title to part of an alley was contested, showed conveyances by a dedicator of lots bounded on a 20-foot street or alley. The court said that the title of the plaintiffs, successors in title to the dedicator, whose heirs had given plaintiffs a deed conveying the street, had been shown beyond controversy.
If the deed had been plaintiff's only source of title the statement by the court would indicate that title to the street or alley remained in the heirs of the dedicator in spite of the conveyances made binding the lots on the alley.
However, it should be noted that the plaintiffs were grantees of two lots, that their deed bound these lots on the alley at *355 the rear of the lots, that the locus in quo part of the street or alley lay immediately in the rear of these two lots. Consequently, the plaintiffs could claim ownership of the locus in quo by the operation of the rule in Salter v. Jonas, as well as by the deed from the heirs. The court, in holding that the title of plaintiffs had been shown beyond controversy, did not state whether it relied on the deed from the heirs or the application of the rule in Salter v. Jonas, but it cannot be contended that it relied solely upon the deed from the heirs.
Thus the cited cases do not establish a restriction on the operation of the rule in Salter v. Jonas which is operative and effective to transfer title to the adjacent half of the street concurrently with execution and delivery of the deed. It does not await the acceptance of the street.
The result contended for by defendant would leave title to the street in the developer until acceptance by the municipality, although title to the lots had been conveyed to the individual purchasers. The rationale of the rule in Salter v. Jonas is that the title to the street should be in the lot owners. In Salter v. Jonas Chief Justice Beasley said:
"In our practice, in the conveyance of lots bounded by streets, the prevailing belief is that the street to its center is conveyed with the lot. Among the mass of the people it is undoubtedly supposed that the street belongs, as an appurtenance, to the contiguous property and that the title to the latter carries with it the title to the former. This belief is so natural that it would not be easily eradicated. As a general practice, it would seem preposterous to sever the ownership to these several parcels of property."
In Wolff v. Veterans of Foreign Wars, Post 4715, 5 N.J. 143 (1950), Justice Case, referring to the title to streets said:
"It does not necessarily follow that it was not an appurtenance, as Chancellor Green suggested, to the contiguous property. * * * It seems much more logical that, lacking proof contra, it should be regarded as belonging to one who owns the adjoining land from which it came, and who is carrying his share of the public load, than that *356 it should have a title about which nobody knows, resting, like the subsoil itself, in the shadows, until, perchance, after long years, the public easement is lifted and value reattaches."
Plaintiffs contend that, by construction, applying the rule in Salter v. Jonas, supra, their titles run to the mean high water line and they offered proof to establish the location of the mean high water line.
Plaintiff's first witness was Surveyor Ayers, who, on April 17, 1954 made observations, photos and measurements to determine the mean high water line. Included in his observation was a line of driftwood and debris. He returned on April 18, 1954 but has not been there since. The court asked him to state the basis on which he located the mean high water line and he answered that he established it relying upon his extensive experience as a surveyor. His survey shows the mean high water line 68 feet to 75 feet seaward of plaintiff Brindley's lot. Ayers said the day was stormy, squally, the wind not strong but probably southeast. He was not sure of the position of the moon but thought it was half moon. However, according to the calendar and almanacs the moon was full on April 18, 1954, and it was the period for spring tides.
The court called the attention of counsel to the definition of mean high water line accepted by the New Jersey courts. It is the line of medium high tide between the spring and neap tides. New Jersey Zinc Iron Co. v. Morris Canal & Banking Co., 44 N.J. Eq. 401 (Ch. 1888). When the moon is in its first and third quarters the tide does not rise as high or fall as low as the average. These are the neap tides which happen twice in 24 hours. The spring tides happen twice every month in the full and change of the moon. There are other factors which influence the tides, such as the direction, strength and constancy of the wind. Northeasterly storms rapidly cut away the beach which is gradually rebuilt by the southeasterly winds.
Peter J. Gannon, Chief of the New Jersey State Bureau of Navigation of the Department of Conservation and Development, *357 stated that the method approved by his department to establish an exact reading in any particular location is to place tide meters on piling in the water and leave them there for months. He said that the position of driftwood and debris on the beach bears no relation to the mean high water line.
Observation made on one or two consecutive days alone are not adequate to establish the location of the mean high water line, considering the variable nature of the tides. Further, the angle of the slope of the beach is acute and a rise or fall of one foot in the tide changes the line of the tide proportionately. Mr. Gannon said that the range of tide, which is the difference in elevation between mean high water and mean low water, in this area is about four feet. From the data submitted the ratio in the area appears to be one to ten. Thus the distance between the mean high water line and the mean low water line on the beach would approximate 40 feet.
The court believes that Ayers' survey located the position of the mean high water line west of the actual location because it was made at full moon, with a southeast wind, with the weather unsettled. These conditions would have advanced the high water mark westerly of the correct location. "In general, with onshore winds or a low barometer the heights of both the high and low waters will be higher than predicted," quoting from the Tide Tables, U.S. Department of Commerce.
Peter J. Gannon produced a map from the files of the Department of Conservation and Economic Development, Bureau of Navigation, entitled, "Survey before construction of Beach Sand Fill, Borough of Lavallette, Dec. 11, 1953." Mr. Gannon stated that the numerals on the map were keyed to the mean high water line, and showed the elevation of the beach with relation to the mean high water line. All figures shown on Ocean Avenue are plus. However, there are figures on the westerly line of the Ocean Avenue area between Virginia Avenue and New Brunswick Avenue near Purdys', which show +1.5, -0.4, and another which is located 20 *358 feet east of the easterly line of Ocean Avenue shows -0.7. The elevation on the westerly side of the Ocean Avenue area between Virginia and New Brunswick Avenues is +11.2 and +9.6. This indicates a 10 to 1 slope and would indicate that the mean high water line on December 11, 1953 in this area was approximately at the easterly edge of the Ocean Avenue area. No elevations are shown on this map within 350 feet of the Hoffman and Brindley properties, but at that distance easterly of Brindley the elevation is shown at 7.8 feet and at that distance easterly of Hoffman the elevation is shown at 6.3 feet.
The purpose of this map was to establish data for a beach fill project and it does not appear whether or not the location of the high water line was incidental or important to the project. The manner of preparation was not proved and Mr. Gannon said the maps show the conditions on a particular day, not an average. He interpreted this map to show the mean high water line, a minimum of 60 feet from the property line and 90 feet to 95 feet at New Brunswick Avenue. Mr. Gannon produced another map entitled, "New Jersey State E.R.A. Riparian Stream and Waterways Survey, dated March 1935." This showed the mean high water line about 150 feet east of Brindley's lot by scaling and computation (1"=200'). The mean high water line was highest at Brown Avenue. There it scaled to coincide with the east line of the Ocean Avenue area. Again the manner of preparation of this map was not proved.
Commander John H. Brittain, Army Engineer, Superintendent of East Coast, produced from his files the latest Coast and Geodetic Survey, mean high water line as of November 1934  March 1935. This map was 1 to 10,000 scale, and he said, subject first to 10, then to 15 feet error in scaling. He further stated that a 16-foot error is allowed in this type of mapping, and that the water line is indefinite on the map. The high water line computed by Commander Brittain by scaling appeared to range from 109.3 feet at New Brunswick Avenue to 141 feet at Kerr Avenue from the property line, all subject to the total error of 31 feet in *359 maping and scaling. He said that the shore line was probably computed by aerial photographs and possibly some field work.
He also produced a work sheet entitled, "N.J. Beach Erosion, Work Sheet #3, Seaside Park to Manasquan, Scale 1"=800', date of Survey June 9 to Aug. 27, 1953." This map did not show Ocean Avenue and plaintiff attempted to use it to prove the location of the mean high water line by scaling it from Grand Central Boulevard about 800 feet away. Defendant would not stipulate as to the distance from Grand Central Boulevard to Ocean Avenue, stating the location had been moved. By scale computation the commander estimated that the mean high water line was 924 feet east of Grand Central Boulevard at New Brunswick Avenue, and 832 feet east of Grand Central Boulevard at Camden Avenue, that the mean high water line is 65 to 70 feet from the end of New Brunswick Avenue, but he was uncertain because the line indicating mean high water line was broad for scaling.
The commander stated that he didn't need tide meters to determine the location of mean high water line and could locate it using theoretical values in combination with tide gauges at Sandy Hook. Further, that his group determines mean high water by its appearance on the beach, that such is an approved method that a layman can use. The court inferred from the testimony that the maps were based on visual observation made on one day.
Taken cumulatively, the maps indicate that the mean high water line at New Brunswick Avenue is near the easterly line of Ocean Avenue and more easterly elsewhere. Plaintiff's lay witness placed high water 10 to 15 feet east of the property line. Defendant's lay witness placed high water 200 feet to 225 feet east of the property line. But their testimony was obviously not grounded on the definition established by the court. The testimony does not establish to the satisfaction of the court that the mean high water line ever came to or westerly of the center line of Ocean Avenue. Consequently, plaintiffs Brindley, Hoffman and Purdy are not littoral owners with preemptive rights to a riparian grant. *360 Preemptive rights are only priority rights to apply for a grant, that a riparian grant shall not be issued to one other than the riparian owner unless he has been given the six months' notice required by the statutes. The State is not required to grant every application. Landis v. Sea Isle City, 129 N.J. Eq. 217 (Ch. 1941); Stevens v. Paterson & Newark R.R. Co., 34 N.J.L. 532 (E. & A. 1870).
From the proofs adduced, the Ocean Avenue area is subject to a dedication arising from the references to Ocean Avenue and to the 1878 map on which Ocean Avenue is delineated, appearing in the deeds made by the Barnegat Land and Improvement Company.
Further the fee to the westerly half of Ocean Avenue fronting their properties is in Brindley, Hoffman and Purdy. Salter v. Jonas, 39 N.J.L. 469 (E. & A. 1877). They also have a private easement over the Ocean Avenue area for the purpose of ingress and egress to their respective properties and appurtenant thereto. Booraem v. North Hudson Railway Company, 40 N.J. Eq. 564. It extends to the owners of the premises and their respective families subject to the qualifications hereinbefore stated. And the fee to the easterly half of Ocean Avenue by application of the rule in the Salter case went to Anna S. Robert by deed dated May 29, 1933 from Caroline L. VanCamp who had acquired the balance of the tract not sold by the Barnegat Land and Improvement Company. Anna S. Robert conveyed the said title to Ingolf Solte by deed dated August 23, 1933.
After the development activities of the Barnegat Land and Improvement Company were concluded the unsold balance of the tract, by various conveyances and a will, came to vest in the trustees of the University of Pennsylvania, who on June 3, 1954 conveyed the Ocean Avenue area (100 feet wide) to the Borough of Lavallette.
In summary, the State of New Jersey own the litus maris, the area between mean high water line and the mean low water line. Landis v. Sea Isle City, 129 N.J. Eq. 217 (Ch. 1941). Ingolf Solte, or his grantees, owns the fee to the area above mean high water line and easterly of the center line of *361 the Ocean Avenue area. The fee to the westerly half of Ocean Avenue in part is in Brindley, Hoffman and Purdy, and the balance of the westerly half is in the Borough of Lavallette by reason of the deed from the trustees of the University of Pennsylvania, excepting the areas in front of ocean front lots, to which the lot owners have the fee title under the rules applied to the Brindley and Hoffman or Purdy lots.
The borough, by adverse user, has acquired an easement over the area east of the west line of Ocean Avenue, extending to mean high water, for recreational purposes, including the maintenance of bathing facilities, boardwalk, summer pavilions, from the north end of the Borough to the southerly side of New Brunswick Avenue.
The evidence shows that the borough has maintained a boardwalk over the westerly side of the said area since 1908, and also has maintained pavilions and drinking fountains on the boardwalk. Further, that the borough has maintained bathing facilities on the beach for many years, supplying ropes, lifeboats and lifeguards since 1915, at different locations on the beach, depending on the current positions of sand bars, which shift. It also has cleaned and policed the beach and participated in the sand fill project.
While the 1950 statute could not give the municipality the right to deprive Brindley, Hoffman or Purdy of their right of access, Union Towel Supply Co. v. Mayor, etc., of Jersey City, 99 N.J.L. 52 (Sup. Ct. 1923), the municipality could and did deprive them of it in part, to the extent of adverse user inconsistent with their right of access.
N.J.S.A. 40:92-7.1 applies only to an area owned by the Borough or in which it has an easement. Thus, by reason of the easement it applies to the area bounded by the north line of the borough, the westerly line of Ocean Avenue, the mean high water line and the southerly line of New Brunswick Avenue. This statute was enacted July 24, 1950, and provides that:
"The governing body of any borough bordering on the Atlantic ocean which owns or shall acquire, by any deed of dedication or *362 otherwise, lands bordering on the ocean, or easement rights therein, for a place of resort for public health and recreation and for other public purposes shall have the exclusive control, government and care thereof and of any boardwalk, bathing and recreational facilities, safeguards and equipment, now or hereafter constructed or provided thereon, and may, by ordinance, make and enforce rules and regulations for the government and policing of such lands, boardwalk, bathing facilities, safeguards and equipment; provided, that such power of control, government, care and policing shall not be construed in any manner to exclude or interfere with the operation of any State law or authority with respect to such lands, property and facilities. Any such borough may, in order to provide funds to improve, maintain and police the same and to protect the same from erosion, encroachment, and damage by sea or otherwise, and to provide facilities and safeguards for public bathing and recreation, including the employment of lifeguards, by ordinance, make and enforce rules and regulations for the government, use, maintenance and policing thereof and provide for the charging and collecting of reasonable fees for the registration of persons using said lands and bathing facilities, for access to the beach and bathing and recreational grounds so provided and for the use of the bathing and recreational facilities, but no such fees shall be charged or collected from children under the age of twelve years."
Although the statute gives the governing body of the municipality the exclusive control, government and care of the lands on which it has the easement, Brindley, Hoffman and Purdy still have their easement for ingress and egress. Barr v. Belmar, 116 N.J. Eq. 466 (Ch. 1934). This private right includes access over Ocean Avenue to the other Borough avenues, and to the litus maris where it adjoins Ocean Avenue. The adverse user by the borough has limited this right insofar as that user has been inconsistent with the right. Thus, they may use the boardwalk for access to their premises, but they cannot successfully demand that it be torn down as an impediment to vehicular traffic. They have no individual vested right to use the area for recreational purposes and if they do, they are subject to the provisions of any ordinance properly enacted under the statute. They also have such rights as the members of the public have to use Ocean Avenue as hereinafter will appear.
Now as to the other plaintiffs who comprise persons who own lots in Lavallette not on the waterfront, taxpayers *363 and residents of the borough. These have the rights of the general public. The general public acquired its right to use Ocean Avenue as a road or highway when the Barnegat Land and Improvement Company referred to it as a lot boundary in its deeds. As an incident of the dedication, they, as a part of the public, acquired the right to use the Ocean Avenue area as a means of travel, to traverse it lengthwise or to cross it to obtain access to the litus maris. But the Legislature has the power to deprive the general public of its rights, as when a road is vacated. The public has no rights so fundamental as to be beyond legislative impairment. Stevens v. Paterson & Newark R.R. Co., 34 N.J.L. 532 (E. & A. 1870). If the Legislature has the power to destroy, it also has the power to modify. Here the Legislature by the provisions of N.J.S.A. 40:92-7.1 has given the municipality the power to raise revenue by charging fees "for the registration of persons using said lands and bathing facilities, * * *." The authority given by the Legislature will control. It is probable that the Legislature, in drawing the act, did not anticipate the conflict that arose in this case between the rights of the general public by reason of the dedication and the rights of the municipality under the act referred to. However, it is the duty of the court to refrain from applying a speculative interpretation of the act and to leave to the Legislature unimpaired its right to determine or to change the status of the rights of the general public.
While the general public has a right to use the area, the 1950 statute gives the municipality the right to regulate the use of the premises and charge those using it license fees for revenue. A valid ordinance would be effective against the general public north of New Brunswick Avenue because of the easement. It would be effective south of New Brunswick Avenue to the extent that the deed from the trustees of the University of Pennsylvania to the borough, conveying title to the Ocean Avenue area is effective to vest title in the borough. For the purposes of this suit, the trustees' deed is not effective to convey title to the easterly half of Ocean Avenue, *364 because that part had by construction been conveyed to Ingolf Solte as heretofore stated, and with regard to the westerly half of Ocean Avenue south of New Brunswick Avenue, there has been no proof adduced in this case that the title of the Barnegat Land and Improvement Company, or those who acquired the unsold portion of the tract which finally vested in the trustees of the University of Pennsylvania, ever became subject to the rule in Salter v. Jonas, supra. On the record before the court, the westerly half of Ocean Avenue below New Brunswick Avenue has vested in the municipality and would therefore be subject to the provisions of the ordinance.
Now with regard to the territorial extent seaward of the borough's jurisdiction, the petition and order for election by which the borough was created in 1887 shows the easterly boundary of the borough to extend to the low water line.
However, L. 1950, c. 324 gives jurisdiction to the municipality only over the lands which it acquired or over the land on which it acquired an easement. Since the municipality's rights north of New Brunswick Avenue depend on adverse user or title, it has acquired no easement there below mean high water line because statutes of limitations do not run against the State, which owns the litus maris. George Van Tassel's Community Funeral Home, Inc. v. Bloomfield, 8 N.J. Super. 524, 531 (Ch. Div. 1950). South of New Brunswick Avenue the borough has jurisdiction based only on such areas to which it acquired title by the trustees' deed. Title to the litus maris in this area is in the State and not in the borough. Thus the ordinance has no application to the litus maris by reason of the 1950 act.
Early in the course of the litigation the plaintiffs sought to have the State of New Jersey joined as a party in interest because of its ownership of the litus maris. The State answered the motion, contending that (a) the State, being a sovereign, cannot be sued without its consent; (b) there has been no legislation granting consent; and (c) that the State by the act of 1950, N.J.S.A. 40:92-7.1, delegates its police power over the litus maris to the adjacent municipalities, *365 and that since the plaintiffs do not question the State's delegation of its police power, but merely the constitutionality of an ordinance adopted under the statutory delegation, the State does not have an interest in such an action. The motion to join the State of New Jersey as a party was denied. Since the State was not made a party and since the first two grounds of objection raised by the State were adequate to dispose of the matter, this court will not accede to defendant's contention that the position taken by the State under the third ground determines the applicability of the statute to the litus maris. The statute applies only to lands bordering on the ocean or easement rights therein which the municipality owns or shall acquire and the municipality has no ownership nor any easement in the ripa maris.
Nor would the ordinance be valid as to the litus maris if the authority of the municipality to enact it was rested upon the police power, because the ordinance does not regulate. Kirsch Holding Co. v. Manasquan, 24 N.J. Super. 91. The ordinance attempts to reserve the right to regulate by resolution. But the proof shows that no proper regulations ever were adopted by the borough council. Hence the ordinance fails to qualify as a regulatory ordinance authorized by the police powers.
Section 3 of Ordinance No. 166 provided, in part, as follows:
"3. The Borough reserves unto itself the right to:
(a) Designate, by resolution, the specific area or areas, * * *.
(b) To adopt Resolutions setting up proper regulations, purchase equipment and supplies for the administration of the project."
It was shown that a set of regulations had been incorporated in a similar prior Ordinance No. 147, and that an additional set of regulations had been prepared by an unofficial committee. This proof falls short of making the ordinance regulatory.
Thus, aside from its invalidity due to discrimination, the ordinance would have validity as to the area between mean high water and the property line, subject to the qualified *366 rights of Brindley, Hoffman and Purdy, and superior to the qualified rights of the public defined above. The ordinance could affect only those persons in the area north of the south line of New Brunswick Avenue and west of the litus maris, or in the area south of the south line of New Brunswick Avenue and westerly of the center line of Ocean Avenue.
A judgment will be entered in accordance with the foregoing statement of findings.