THE BOROUGH OF NEPTUNE CITY, A MUNICIPAL COR-
PORATION OF THE STATE OF NEW JERSEY, LILYAN
BURKE AND EVELYN IRONS, PLAINTIFFS-APPEL-
ANTS, v. THE BOROUGH OF AVON-BY-THE-SEA, A MU-
NICIPAL CORPORATION OF THE STATE OF NEW JER-
SEY, HARRY B. CROOK, JR., MAYOR AND COMMIS-
SIONER OF THE BOROUGH OF AVON-BY-THE-SEA,
JOHN T. LIVINGSTON AND JAMES A. ROGERS, COM-
MISSIONERS OF THE BOROUGH OF AVON-BY-THE-
SEA, AND ALBERT R. DORN, CLERK OF THE BOROUGH
OF AVON-BY-THE-SEA, DEFENDANTS-RESPONDENTS.

Argued March 6, 1972—Decided July 24, 1972.

Mr. *Robert V. Carton* argued the cause for plaintiffs-appellants (*Messrs. Carton, Nary, Witt & Arvanitis,* attorneys; Mr. *Robert V. Carton,* of counsel and on the brief).

Mr. *Thomas J. Spinello* argued the cause for defendants-respondents.

The opinion of the Court was delivered by

HALL, J. The question presented by this case is whether an oceanfront municipality may charge non-residents higher fees than residents for the use of its beach area. The Law Division sustained an amendatory ordinance of defendant

Borough of Avon-by-the-Sea (Avon) so providing. 114
*N. J. Super.* 115 (1971). The challenge came from plain-
tiffs Borough of Neptune City, an adjacent inland mu-
nicipality, and two of its residents. We granted plaintiffs'
motion to certify their appeal to the Appellate Division be-
fore argument in that tribunal. *R.* 2:12–2. The question
posed is of ever increasing importance in our metropolitan
area.[1] We believe that the answer to it should turn on the
application of what has become known as the public trust
doctrine.

Avon, in common with other New Jersey municipalities
bordering on the Atlantic Ocean, is a seasonal resort-oriented
community. The attraction to the influx of temporary resi-
dents and day visitors in the summer months is, of course,
the ocean beach for bathing and associated recreational plea-
sures and benefits. *See Kirsch Holding Co. v. Borough of
Manasquan,* 59 *N. J.* 241, 243–244 (1971). According to
the stipulation of facts, Avon's year-round population of
1850, resident within its approximately seven square block
area, is increased in the summertime to about 5500 people
(not counting day visitors), with the seasonal increase living
in four hotels, 40 rooming and boarding houses and in-
numerable rented and owned private dwellings.

The municipality borders on the ocean for its full
north-south length. Ocean Avenue, a county highway, is
the easternmost street. Municipal east-west streets end at
Ocean Avenue. Between it and the ordinary high water line
or mark of the ocean waters are located an elevated board-
walk and a considerable stretch of sand, dry except in time
of storms and exceptionally high tides. This stretch, as well
as the boardwalk, is owned and maintained by the munici-
pality and has been for many years. Although the deriva-
tion of the borough's title is not contained in the record,
there is no dispute that the sand area has been dedicated for

---

[1] *See N. Y. Times,* July 10, 1972, p. 1, col. 1.

public beach recreational purposes—in effect, a public park—and is used for access by bathers to the water, as well as for sunning, lounging and other usual beach activities. The tide-flowed land lying between the mean high and low water marks, as well as the ocean covered land seaward thereof to the state's boundary is owned by the State in fee simple, *Bailey v. Driscoll*, 19 *N. J.* 363, 367–368 (1955). There has been no alienation in any respect of that land bordering Avon; even if this state-owned land had been conveyed to Avon, it would be required to maintain that land as a public park for public use, resort and recreation. N. J. S. A. 12:3–33, 34.

Years ago Avon's beach, like the rest of the New Jersey shore, was free to all comers. As the trial court pointed out, "with the advent of automobile traffic and the ever-increasing number of vacationers, the beaches and bathing facilities became overcrowded and the beachfront municipalities began to take steps to limit the congestion by regulating the use of the beach facilities and by charging fees." 114 *N. J. Super.* at 117. It also seems obvious that local financial considerations entered into the picture. Maintenance of beachfronts is expensive and adds substantially to the municipal tax levy if paid for out of property taxes. Not only are there the costs of lifeguards, policing, cleaning, and the like, but also involved are capital expenses to prevent or repair erosion and storm damage through the construction of jetties, groins, bulkheads and similar devices. (Construction of the latter is generally aided in considerable part, as it has been in Avon, by state and other governmental funds.) In addition, the seasonal population increase requires the expansion of municipal services and personnel in the fields of public safety, health and order. On the other hand, the values of real estate in the community, both commercial and residential, are undoubtedly greater than those of similar properties in inland municipalities by reason of the proximity of the ocean and the accessibility of the beach. And commercial enterprises located in the town are more valuable

because of the patronage of large numbers of summer visitors. (Avon does not have, in contrast with many other shore communities, extensive boardwalk stores and amusements.)

██ ██ Legislative authority to municipalities to charge beach user fees, for revenue purposes, was granted by two identical statutes—the first, *L.* 1950, *c.* 324, *p.* 1083, *N. J. S. A.* 40:92–7.1, applicable only to boroughs, and the second, *L.* 1955, *c.* 49, p. 165, *N. J. S. A.* 40:61–22.20, applicable to all municipalities. The latter reads as follows:

The governing body of any municipality bordering on the Atlantic ocean, tidal water bays or rivers which owns or shall acquire, by any deed of dedication or otherwise, lands bordering on the ocean, tidal water bays or rivers, or easement rights therein, for a place of resort for public health and recreation and for other public purposes shall have the exclusive control, government and care thereof and of any boardwalk, bathing and recreational facilities, safeguards and equipment, now or hereafter constructed or provided thereon, and may, by ordinance, make and enforce rules and regulations for the government and policing of such lands, boardwalk, bathing facilities, safeguards and equipment; provided, that such power of control, government, care and policing shall not be construed in any manner to exclude or interfere with the operation of any State law or authority with respect to such lands, property and facilities. Any such municipality may, in order to provide funds to improve, maintain and police the same and to protect the same from erosion, encroachment and damage by sea or otherwise, and to provide facilities and safeguards for public bathing and recreation, including the employment of lifeguards, by ordinance, make and enforce rules and regulations for the government, use, maintenance and policing thereof and provide for the charging and collecting of reasonable fees for the registration of persons using said lands and bathing facilities, for access to the beach and bathing and recreational grounds so provided and for the use of the bathing and recreational facilities, but no such fees shall be charged or collected from children under the age of 12 years.

In passing we should say that we see no legislative intent therein to authorize discrimination in municipal beach fees between residents and non-residents. The statute amounts to a delegation to a municipality having a dedicated beach (dry sand area) of the state's police power over that area and the tide-flowed land seaward of the mean high water

mark; the proviso indicates an affirmation of the state's paramount interest and inherent obligation in insuring that such seaward land be equally available for the use of all citizens.

Until 1970 Avon's ordinance, adopted pursuant to the quoted statute, made no distinction in charges as between residents and non-residents. The scheme then and since is that of registration and issuance of season, monthly or daily identification badges for access to and use of the beach area east of the boardwalk. (The boardwalk is open and free to all.) The amounts of money involved are substantial. In 1969, 32,741 badges of all categories were issued and the revenue from beachfront operations totalled $149,758.15, which went into the borough's general revenues.

The distinction between residents and non-residents was made by an amendment to the ordinance in 1970, the enactment which is attacked in this case. It was accomplished by making the rate for a monthly badge the same as that charged for a full season's badge ($10.00), by restricting the sale of season badges to residents and taxpayers of Avon and the members of their immediate families, and also apparently by substantially increasing the rates for daily badges (from $1.00 and $1.25 to $1.50 and $2.25). A "resident" is defined as any person living within the territorial boundaries of the borough for not less than 60 consecutive days in the particular calendar year. The result is considerably higher charges for non-residents under the definition than for permanent residents, taxpayers and those staying 60 days or more. Residents of Neptune City, for example, using the beach daily, would pay twice as much for the season (two monthly badges) as residents of Avon.

█ Plaintiffs attacked the ordinance on several grounds, including the claim of a common law right of access to the ocean in all citizens of the state. This in essence amounts to reliance upon the public trust doctrine, although not denominated by plaintiffs as such. Avon, although inferentially recognizing some such right, defended its amendatory

ordinance on the thesis, accepted by the trial court, that its property taxpayers should nevertheless not be called upon to bear the expense, above non-discriminating beach user fees received, of the cost of operating and maintaining the beachfront, claimed to result from use by non-residents and that consequently the discrimination in fees was not irrational or invidious. All recognized that an oceanfront municipality may not absolutely exclude non-residents from the use of its dedicated beach, including, of course, land seaward of the mean high water mark; a trial court decision, *Brindley v. Lavallette*, 33 *N. J. Super*. 344, 348–349 (Law Div. 1954), had so held, although not by reliance upon the public trust doctrine. We approve that holding.

Avon's proofs, based on 1969 figures, sought to show a deficit of about $50,000 between user fees received in that year and the costs of operation and maintenance of the beach. The cost figures were derived from estimates of the portions of budgetary line items said to be attributable to the beach as well as from projections on an annual basis of expected future capital expenses. Plaintiffs urge that some of these allocations are unsound. Moreover, there was no showing that the same costs would not be incurred even if only residents (under the definition) used the beach, nor was it demonstrated that the 1970 discriminatory fee schedule closed the alleged financial gap.

We prefer, however, not to treat the case on this basis, but rather, as we indicated at the outset, to approach it from the more fundamental viewpoint of the modern meaning and application of the public trust doctrine.

That broad doctrine derives from the ancient principle of English law that land covered by tidal waters belonged to the sovereign, but for the common use of all the people. Such lands passed to the respective states as a result of the American Revolution. For recent dissertations on the history, development and modern connotations of the doctrine, *see generally* 1 *Waters and Water Rights* (Clark ed. 1967), §§ 36.3, 36.4, pp. 190–202; Sax, "The Public Trust Doc-

trine in Natural Resource Law: Effective Judicial Intervention," 68 *Mich. L. Rev.* 471 (1970); Note, "The Public Trust in Tidal Areas: A Sometime Submerged Traditional Doctrine," 79 *Yale L. J.* 762 (1970); and with particular reference to New Jersey, Note, Jaffee, "State Citizen Rights Respecting Greatwater Resource Allocation: From Rome to New Jersey," 25 *Rutgers L. Rev.* 571 (1971).

A succinct statement of the principle is found in the leading case of *Illinois Central Railroad Company v. People of State of Illinois,* 146 *U. S.* 387, 435, 13 S. Ct. 110, 111, 36 *L. Ed.* 1018, 1036 (1892):

> It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several states, belong to the respective states within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the states. This doctrine has been often announced by this court . . . .

The original purpose of the doctrine was to preserve for the use of all the public natural water resources for navigation and commerce, waterways being the principal transportation arteries of early days, and for fishing, an important source of food. This is also well pointed up in *Illinois Central*:

> It is a title held in trust for the people of the State, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks, and piers therein, for which purpose the State may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters that may afford foundation for wharves, piers, docks, and other structures in aid of commerce, and grants of parcels which, being occupied, do not sub-

stantially impair the public interest in the lands and water remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State. (146 *U. S.* at 452, 13 *S. Ct.* at 118, 36 *L. Ed.* at 1042)

There is not the slightest doubt that New Jersey has always recognized the trust doctrine.[2] The basic case is *Arnold v. Mundy, 6 N. J. L.* 1 (Sup. Ct. 1821), where Chief Justice Kirkpatrick spoke as follows:

Every thing susceptible of property is considered as belonging to the nation that possesses the country, and as forming the entire mass of its wealth. But the nation does not possess all those things in the same manner. By very far the greater part of them are divided among the individuals of the nation, and become *private property.* Those things not divided among the individuals still belong to the nation, and are called *public property.* Of these, again, some are reserved for the necessities of the state, and are used for the public benefit, and those are called *"the domain of the crown or of the republic;"* others remain common to all the citizens, who take of them and use them, each according to his necessities, and according to the laws which regulate their use, and are called *common property.* Of this latter kind, according to the writers upon the law of nature and of nations, and upon the civil law, are the air, the running water, the sea, the fish, and the wild beasts. *Vattel lib. i,* 20. 2 *Black Com.* 14. But inasmuch as the things which constitute this *common property* are things in which a sort of transient usufructuary possession, only, can be had; and inasmuch as the title to them and to the soil by which they are supported, and to which they are appurtenant, cannot well, according to the common law notion of title, be vested in all the people; therefore, the wisdom of that law has placed it in the hands of the sovereign power, to be held, protected, and regulated for the common use and benefit. But still, though this title, strictly speaking, is in the sovereign, yet the use is common to all the people. (6 *N. J. L.* at 71)

\* \* \* \* \* \* \* \*

And I am further of opinion, that, upon the Revolution, all these royal rights became vested in *the people* of New Jersey as the sovereign of the country, and are now in their hands; and that they, having, themselves, both the legal title and the usufruct, may make

---

[2]In probably most states the doctrine covers all navigable waters, non-tidal as well as tidal. New Jersey early limited it to tidal waters and does not apply the navigability test. *Cobb v. Davenport*, 32 *N. J. L.* 369 (Sup. Ct. 1867).

such disposition of them, and such regulation concerning them, as they may think fit; that this power of disposition and regulation must be exercised by them in their sovereign capacity; that the legislature is their rightful representative in this respect, and, therefore, that the legislature, in the exercise of this power, may lawfully erect ports, harbours, basins, docks, and wharves on the coasts of the sea and in the arms thereof, and in the navigable rivers; that they may bank off those waters and reclaim the land upon the shores; that they may build dams, locks, and bridges for the improvement of the navigation and the ease of passage; that they may clear and improve fishing places, to increase the product of the fishery; that they may create, enlarge, and improve oyster beds, by planting oysters therein in order to procure a more ample supply; that they may do these things, themselves, at the public expense, or they may authorize others to do it by their own labour, and at their own expense, giving them reasonable tolls, rents, profits, or exclusive and temporary enjoyments; but still this power, which may be thus exercised by the sovereignty of the state, is nothing more than what is called the *jus regium*, the right of regulating, improving, and securing for the common benefit of every individual citizen. The sovereign power itself, therefore, cannot, consistently with the principles of the law of nature and the constitution of a well ordered society, make a direct and absolute grant of the waters of the state, divesting all the citizens of their common right. It would be a grievance which never could be long borne by a free people. (6 *N. J. L.* at 78)

Similar expressions are found throughout our decisions down through the years. *See e. g., Cobb v. Davenport,* 32 *N. J. L.* 369, 378–379 (Sup. Ct. 1867); *Ross v. Mayor and Council of Borough of Edgewater,* 115 *N. J. L.* 477, 483 (Sup. Ct. 1935), affirmed o. b. 116 *N. J. L.* 447 (E. & A. 1936), *cert.* den. 299 *U. S.* 543, 57 S. Ct. 37, 81 *L. Ed.* 400 (1936); *Bailey v. Driscoll, supra* (19 *N. J.* at 367–368); *Baker v. Normanoch Ass'n, Inc.,* 25 *N. J.* 407, 414 (1957).

It is safe to say, however, that the scope and limitations of the doctrine in this state have never been defined with any great degree of precision. That it represents a deeply inherent right of the citizenry cannot be disputed. Two aspects should be particularly mentioned, one only tangentially involved in this case and the latter directly pertinent. The former relates to the lawful extent of the power of the legislature to alienate trust lands to private parties; the latter to the inclusion within the doctrine of public accessibility

to and use of such lands for recreation and health, including bathing, boating and associated activities. Both are of prime importance in this day and age. Remaining tidal water resources still in the ownership of the State are becoming very scarce, demands upon them by reason of increased population, industrial development and their popularity for recreational uses and open space are much heavier, and their importance to the public welfare has become much more apparent. *Cf. New Jersey Sports & Exposition Authority v. McCrane*, 61 *N. J.* 1, at 55 (1972) (concurring and dissenting opinion of Hall, J.). All of these factors mandate more precise attention to the doctrine.

Here we are not directly concerned with the extent of legislative power to alienate tidal lands because the lands seaward of the mean high water line remain in state ownership, the municipality owns the bordering land, which is dedicated to park and beach purposes, and no problem of physical access by the public to the ocean exists. The matter of legislative alienation in this state should, nonetheless, be briefly adverted to since it has a tangential bearing. As the earlier quotations indicate, it has always been assumed that the State may convey or grant rights in some tidal lands to private persons where the use to be made thereof is consistent with and in furtherance of the purposes of the doctrine, *e. g.*, the improvement of commerce and navigation redounding to the benefit of the public. However, our cases rather early began to broadly say that the State's power to vacate or abridge public rights in tidal lands is absolute and unlimited, and our statutes dealing with state conveyances of such lands contain few, if any, limitations thereon. (The statutes are collected in *Revised Statutes, Chapter 3, Riparian Lands*, of Title 12, Commerce and Navigation, *N. J. S. A.* 12 :3-1 *et seq.*). An early case so indictating is *Stevens v. Paterson & Newark Railroad Co.*, 34 *N. J. L.* 532, 549-552 (E. & A. 1870) ; a more recent example is *Schultz v. Wilson*, 44 *N. J. Super.* 591, 597 (App. Div. 1957), certif. den. 24 *N. J.* 546 (1957). *But see Borough of Wildwood*

*Crest v. Masciarella*, 51 *N. J.* 352, 358 (1968). *See also Mayor and Council of City of Hoboken v. Pennsylvania Railroad Co.*, 124 *U. S.* 656, 688–691, 8 S. Ct. 643, 653–655, 31 *L. Ed.* 543, 551–552 (1888) ; *Shively v. Bowlby*, 152 *U. S.* 1, 21–23, 14 S. Ct. 548, 555–556, 38 *L. Ed.* 331, 339–340 (1894), purporting to summarize the New Jersey law to that date. *But compare Illinois Central Railroad Company v. People of State of Illinois, supra,* 146 *U. S.* at 453, 13 S. Ct. at 118, 36 *L. Ed.* at 1042, holding that a state may not completely abdicate its obligations with respect to such lands :

The trust devolving upon the state for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.

■ ■ The observation to be made is that the statements in our cases of an unlimited power in the legislature to convey such trust lands to private persons may well be too broad. It may be that some such prior conveyances constituted an improper alienation of trust property or at least that they are impliedly impressed with certain obligations on the grantee to use the conveyed lands only consistently with the public rights therein. For example, the conveyance of tide-flowed lands bordered by an ocean dry sand area in private ownership to the owner thereof may well be subject to the right of the public to use the ocean waters. And, whether or not there was any such conveyance of tidal land, the problem of a means of public access to that land and the ocean exists. This case does not require resolution of such issues and we express no opinion on them. We mention this alienation aspect to indicate that, at least where the upland sand area is owned by a municipality—a political subdivision and creature of the state—and dedicated to

public beach purposes, a modern court must take the view that the public trust doctrine dictates that the beach and the ocean waters must be open to all on equal terms and without preference and that any contrary state or municipal action is impermissible.

▮▮ We have no difficulty in finding that, in this latter half of the twentieth century, the public rights in tidal lands are not limited to the ancient prerogatives of navigation and fishing, but extend as well to recreational uses, including bathing, swimming and other shore activities. The public trust doctrine, like all common law principles, should not be considered fixed or static, but should be molded and extended to meet changing conditions and needs of the public it was created to benefit. The legislature appears to have had such an extension in mind in enacting *N. J. S. A.* 12:3–33, 34, previously mentioned. Those sections, generally speaking, authorize grants to governmental bodies of tide-flowed lands which front upon a public park extending to such lands, but only upon condition that any land so granted shall be maintained as a public park for public use, resort and recreation. *Cf. Martin v. City of Asbury Park,* 114 *N. J. L.* 298 (E. & A. 1935).

Other states have readily extended the doctrine, beyond the original purposes of navigation and fishing, to cover other public uses, and especially recreational uses. In Massachusetts, it was held many years ago that "it would be too strict a doctrine to hold that the trust for the public, under which the state holds and controls navigable tide waters and the land under them, beyond the line of private ownership, is for navigation alone. It is wider in its scope, and it includes all necessary and proper uses, in the interest of the public." *Home for Aged Women v. Commonwealth,* 202 *Mass.* 422, 89 *N. E.* 124, 129 (1909). Wisconsin, where the doctrine covers all navigable waters, has long held that it extends to all public uses of water including pleasure boating, sailing, fishing, swimming, hunting, skating and enjoyment of scenic beauty. Representative modern cases are *Hixon v.*

*Public Service Commission,* 32 *Wis.* 2d 608, 146 *N. W.* 2d 577, 582 (1966); *Muench v. Public Service Commission,* 261 *Wis.* 492, 53 *N. W.* 2d 514, 520 (1952), affirmed on rehearing 261 *Wis.* 492, 55 *N. W.* 2d 40 (1952). Courts in several other states have recently recognized the vital public interest in the use of the sea shore for recreational purposes and have, under various theories consistent with their own law, asserted the public rights in such land to be superior to private or municipal interests. *See e. g., State ex rel. Thornton v. Hay,* 254 *Or.* 584, 462 *P.* 2d 671 (1969); *Gion v. City of Santa Cruz,* 2 *Cal.* 3d 29, 84 *Cal. Rptr.* 162, 465 *P.* 2d 50 (1970); *Gewirtz v. City of Long Beach,* 69 *Misc.* 2d 763, 330 *N. Y. S.* 2d 495 (Sup. Ct., Nassau Cty. 1972). Modern text writers and commentators assert that the trend of the law is, or should be, in the same direction. 1 *Waters and Water Rights, supra,* § 36.4(B), pp. 200–202; Sax, *supra,* 68 *Mich. L. Rev.* at 556, 565; Note, *supra,* 79 *Yale L. J.* at 777–778, 784–785; Note, Jaffee, *supra,* 25 *Rutgers L. Rev.,* at 608 n. 226, 690, 701.

We are convinced it has to follow that, while municipalities may validly charge reasonable fees for the use of their beaches, they may not discriminate in any respect between their residents and non-residents. The Avon amendatory ordinance of 1970 clearly does so by restricting the sale of season badges to residents, as defined in the ordinance, resulting in a lower fee to them. In addition the fee for daily badges, which would be utilized mostly by non-residents, may have been as well discriminatorily designed with respect to the amount of the charge. Since we cannot tell what fee schedule the municipality would have adopted when it passed this ordinance in 1970 if it had to do so on the basis of equal treatment for all, we see no other course but to set aside the entire amendatory enactment.

We recognize, however, that Avon has operated under the present schedule since 1970 and that the present beach season is about half over. Other oceanfront municipalities may well have similar enactments. Also Avon very

likely has operated its budget and financial affairs on the basis of the beach user fees expected to be collected under the present schedule in reliance upon the trial court decision. To attempt now to turn the clock back to the non-discriminatory schedule (with considerably lower charges) specified in the pre-amendment ordinance would only create hopeless practical confusion and some unfairness to the municipality and its taxpayers. We therefore determine that the judgment to be entered pursuant to this opinion should operate prospectively only and become effective on January 1, 1973.

 We ought also to say that we fully appreciate the burdens, financial and otherwise, resting upon our oceanfront municipalities by reason of the attraction of the sea and their beaches in the summer season to large numbers of people not permanently resident in the community. The rationale behind *N. J. S. A.* 40:61–22.20 certainly is that such municipalities may properly pass on some or all of the financial burden, as they decide, by imposing reasonable beach user fees, which we have held here must be uniform for all. We think it quite appropriate that such municipalities may, in arriving at such fees, consider all additional costs legitimately attributable to the operation and maintenance of the beachfront, including direct beach operational expenses, additional personnel and services required in the entire community, debt service of outstanding obligations incurred for beach improvement and preservation, and a reasonable annual reserve designed to meet expected future capital expenses therefor. They may also, we think, very properly regulate and limit, on a first come, first served basis, the number of persons allowed on the beach at any one time in the interest of safety.

The judgment of the Law Division is reversed and the cause is remanded to that tribunal for the entry of a judgment consistent with this opinion. No costs.

FRANCIS, J. (dissenting). I cannot agree with the result reached by the majority.

It is undisputed that anciently and currently the sovereign—here the State of New Jersey—owns the fee title to the portion of the ocean beach front seaward of the mean high water mark. Nor can it be denied that the beach area landward of the mean high water mark is owned by the upland title holder. I agree that the people have the right to use and enjoy the ocean in common, and that the right includes use in common of the beach area seaward of the mean high water mark; such is the public trust doctrine. In the absence of some unusual circumstance, or some reasonable regulation by the State, it is undoubtedly true that no person using *that strip* as an incident of his temporary enjoyment of the ocean can be considered a trespasser. Reference has been made to the fact that in the past agencies of the State have either given or sold certain riparian grants purporting to convey to the upland owner title to the land for a specified distance seaward of the mean high water mark. It has been suggested that the land described in such grants (at least the portion thereof remaining in its natural state) would be subject to the common public right to use and enjoy the strip between the mean high water mark and the ocean. But that problem is not before us now.

However, the majority opinion here states views upon a subject of serious consequence to ocean front communities and to the owners, private or public, of beach front land above the mean high water mark. The basic question may be couched in these terms: Since the people generally have the common right to use and enjoy the ocean and the portion of the beach below the mean high water mark, of what utility is that right if access from the upland does not exist or is refused by the upland owner? Although the majority opinion disclaims any positive ruling on the subject, it seems to imply that exercise of the common right carries with it by way of implementation, the right to use and enjoy *any* beach upland for purposes of recreation and access to the ocean.

In my view, the common right is not so pervasive. Of course, generally speaking reasonable access to the ocean and to the land strip which is in the public domain cannot be denied, but the law does not require that such access be without limitation or qualification. In localities where ocean front municipalities do not own or operate public beaches, and all ocean front property is in private ownership, such municipalities, as a legitimate *exercise of their right of eminent domain,* could provide for reasonable public access. For example, we are told that in some out of state communities where title to the public roads terminates at high or low water mark, the beach for the width of the road is regarded as subject to an easement of way for members of the public to the longitudinal strip of beach front seaward of the mean high water mark and into the ocean. But, whatever the technical situation in those places, it does not mean in this State that privately owned beach area upland of the mean high water mark is subject to public use. In my judgment a private owner could legally fence in his entire beach area upland of the mean high water mark, if he was moved to do so.

Communities like Avon which have only a few blocks of ocean front are aware that their publicly owned and maintained beaches risk overcrowding to the detriment of local residents and taxpayers unless some reasonable limitations are imposed on use by non-residents. In my view it is neither arbitrary nor invidiously discriminatory for the local governing body which owns, operates and maintains a public beach in the interest of its residents to charge a higher daily, weekly or monthly fee to non-residents who seek the privilege of using the beach. Avon has the right, I think, to fence in its beach to the mean high water mark, if it wishes and restrict the use thereof to its own residents and taxpayers with or without an admission fee. If it wishes to open this upland beach (owned by it) to use by non-residents, I see nothing in *N. J. S. A.* 40:92–7.1 or *N. J. S. A.* 40:61–22.20 which prohibits the municipality from imposing reasonable limits

on the invitation by means of a charge of higher use fees to the non-residents. Accordingly, I see no merit in the contention that the inequality between the fees Avon charges for use of its upland beach to its own residents and tax-payers, and those charged to non-residents, renders illegal the fees imposed upon the non-residents.

For the reasons stated, I would affirm the judgment of the trial court. Justice Mountain joins in this dissent.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, HALL and SCHETTINO—4.

*For affirmance*—Justices FRANCIS and MOUNTAIN—2.